The State, *ex rel.,* v. Wyandotte County.

No. 26,045.

THE STATE OF KANSAS, ex rel. JUSTUS N. BAIRD, as County Attorney
of Wyandotte County, *Plaintiff,* v. THE BOARD OF COUNTY COM-
MISSIONERS OF WYANDOTTE COUNTY and A. H. GILLIS & COM-
PANY, *Defendants.*

### SYLLABUS BY THE COURT.

QUO WARRANTO—*Bonds—Petition Asking for Declaratory Judgment as to
Validity of Bonds—This Court, Exercising Its Discretion to Grant or Refuse
Relief Asked for, Declines to Make a Binding Declaration Respecting the
Matter.* Under circumstances stated in the opinion, the court exercises the
discretion it possesses to grant or refuse relief in actions of quo warranto, and
declines to make a binding declaration respecting validity of an issue of
municipal bonds.

Original proceedings in quo warranto. Opinion filed November 8, 1924.
Dismissed.

*Justus N. Baird,* county attorney, and *C. W. Trickett,* of Kansas City, for
the plaintiff.

*J. H. Brady,* of Kansas City, for defendant the board of county commis-
sioners of Wyandotte county; *Chester I. Long, J. D. Houston, Austin M.
Cowan, Claude I. Depew, James G. Norton, W. E. Stanley, James G. Martin,*
all of Wichita, *Justin D. Bowersock, Robert B. Fizzell,* and *John F. Rhodes,* all
of Kansas City, Mo., for defendants A. H. Gillis & Company.

The opinion of the court was delivered by

BURCH, J.: The action was commenced by the state of Kansas,
on the relation of the county attorney of Wyandotte county, against
the board of county commissioners of Wyandotte county, to obtain
a declaratory judgment that certain bonds of the county, in the
sum of $472,450, are void because issued without lawful authority.
The bonds had been executed and registered and were about to be
delivered to a purchaser, pursuant to a contract of sale.

The petition was filed on the evening of September 29, 1924. It
stated facts on which the relief prayed for was predicated, and was
accompanied by a transcript of the proceedings upon which the
bond issue was based. As an incident to declaration of invalidity of
the bonds, ouster of the members of the board from office was sought.
Pursuant to application of plaintiff, the board was immediately
cited to answer on or before October 6, the first day of the October,
1924, session of the court. Plaintiff refrained from asking for an
order prohibiting delivery of the bonds pending determination of

the controversy.  On the morning of October 1 the board appeared and represented to the court that within a few hours the purchaser of the bonds would tender the price and demand delivery, and that the procedure adopted by plaintiff placed the board, as a state agency, and placed the members individually, in peril.  Therefore the board requested instruction.  The court lacked authority to grant the request.  In order, however, to gain possession of the entire controversy and equip itself to act advisedly, the court, on its own motion, made the purchaser of the bonds a party to the suit, required the purchaser to plead by October 6, and restrained action relating to consummation of the bond sale until further order.

The board of county commissioners answered that they were proposing to issue the bonds pursuant to the proceedings disclosed in the transcript.  The purchaser filed a motion to dismiss.  The cause was heard on the petition, the answer, and the motion.  At the hearing the prayer of the petition that the members of the board be ousted from office was abandoned.  A brief was filed for the state, and, at the court's request, the purchaser filed a brief on the merits, which the board of county commissioners adopted.  Two principal subjects of controversy were disclosed: First, Was the bond issue valid under the laws of this state?  Second, Was the first subject *res judicata,* as against the state, because of adjudications sustaining the bonds by the United States district court for the district of Kansas and by the district court of Wyandotte county, in actions to which all the state agencies concerned the Kaw Valley drainage board, the board of county commissioners, and the city of Kansas City, Kan., were parties?

The bonds were issued to provide funds for the reconstruction of the bridge across the Kansas river at Twelfth street in the city of Kansas City, in Wyandotte county.  Formerly, in time of flood, territory adjoining and adjacent to the river throughout its course within the city was subject to inundation, and the flood of 1903 occasioned appalling destruction of property.  In 1905 the legislature passed an act relating to natural watercourses, which provided for the organization of public corporations to take charge of and exercise control over such watercourses, in order to prevent overflow, or lessen the volume of overflow, and so prevent or minimize damage by flood.  (R. S. 24-401 *et seq.*)  Under this statute the Kaw Valley drainage district of Wyandotte county was organized, and was vested with exclusive control over the bed, channel and banks of

The State, *ex rel.*, v. Wyandotte County.

the stream, with authority to deepen, widen, establish, regulate and maintain the channel; build levees; prescribe, regulate, and fix the height of superstructures of bridges, the length of bridge spans, and the location of bridge piers; and to maintain suits to enforce its reasonable orders. The grant of power was without doubt intended to be plenary, to the end that hazard from the watercourse might be reduced or rendered nonexistent.

In 1909 an act was passed, applying to Wyandotte county, containing the following provisions:

"Whenever in any county having an assessed valuation for taxation purposes of over ninety million dollars the board of directors of any drainage district organized under the laws of this state, under the powers vested in them, shall prescribe, regulate or fix the height of any public bridge located within said district or the length of spans and the location of piers or abutments of any such bridge, or shall locate harbor lines for or establish the channel of any stream within such district, and shall notify and request, in writing, the board of county commissioners to change, alter or reconstruct any such bridge or bridges to conform to such harbor lines, channel or requirements; or whenever in any county the secretary of war of the United States, or any other competent authority, shall request, order or direct, in writing, the reconstruction, raising or lengthening of any public bridge, or the spans thereof, over any navigable stream, or shall request, order or direct the reconstruction or relocation of the piers or abutments of any public bridge over a navigable stream, or shall establish harbor lines or otherwise designate the channel for any navigable stream, and shall request, order or direct the reconstruction of bridges to conform thereto; the board of county commissioners of the county wherein such public bridge is located is hereby authorized and empowered to reconstruct such bridges and approaches thereto, raise, lengthen and repair such bridges, and to reconstruct, remove and relocate the abutments and piers thereof, and to improve such bridges in any other respect required, and to do any and all acts necessary to conform to such requirements, in the manner hereinafter provided, and for the purpose of paying for such improvements may issue bonds of such county without the same being authorized by any election, and subject only to the limitations contained in this act. The amount of bonds so authorized to be issued shall not exceed the actual cost of such improvements." (R. S. 68-1401.)

"It shall be the duty of the county commissioners of any county of this state to which this act applies now or hereafter having therein any public bridge or bridges over any navigable river, which bridge or bridges have been ordered or shall hereafter be ordered or required by the secretary of war of the United States, or the board of directors of any drainage district organized under the laws of this state, in any county having an assessed valuation for taxation purposes of over ninety million dollars, to be removed, relocated, reconstructed or improved, to take possession of such bridges and to forthwith remove, relocate reconstruct or improve the same, as may be necessary and

proper, and the ownership and control of such bridges is hereby vested in such counties. . . ." (R. S. 68-1405.)

In August, 1919, the drainage board adopted a resolution, the propriety of which is not disputed, relating to structural changes in the Twelfth street bridge, and directed the board of county commissioners to make the bridge conform to the resolution. It will be observed that, under the statutes quoted, two distinct questions may arise: First, What may the drainage board lawfully do? And second, After lawful action by the drainage board, and request upon the county board, what may the county board lawfully do? The bridge was built in 1889, and was reconstructed in 1903-'04, under a special act of the legislature of 1903, following the flood of that year. The county board was obliged to consider the bridge problem presented to it from three viewpoints: (1) abatement of a public nuisance, or at least removal of a public menace, disclosed by resolution and order of the drainage board; (2) usefulness of the bridge as a public thoroughfare; (3) prudent management of the public business. The county board was advised by its engineers that nothing but reconstruction of the entire bridge would be practical, and indicated its willingness to comply with an order to that effect. On January 9, 1920, the drainage board adopted a resolution condemning the bridge and requiring its removal and construction of another.

The Kansas City Railways Company, a Missouri corporation, had been concerned in the reconstruction of the bridge in 1903, and was using the bridge for transportation of passengers and mail in interstate commerce pursuant to contract with the county board and under a franchise granted by the city of Kansas City. On January 9, 1920, the railways company commenced suit in the United States district court for the district of Kansas against the drainage board and the county board to enjoin enforcement of the drainage board's order. On March 1, 1920, the county board adopted a resolution to reconstruct the bridge. Execution of the resolution was stopped by a restraining order of the federal court. Answers were filed by all defendants, and amended and supplemental pleadings were subsequently filed by all parties, whereby all questions of law and fact pertaining to the entire Twelfth street bridge controversy were deposited in the lap of the federal court.

The federal court had taken jurisdiction on the grounds of diversity of citizenship and invasion of constitutional right of the

railways company, both under its claimed interest in the bridge and as a taxpayer of the drainage district. Having taken jurisdiction, the court evidently deemed it a duty to dispose of the whole controversy according to the usage of courts of equity under such circumstances. In June, 1922, the court proposed a sensible, practical and efficient substitute for the routine procedure in equity cases, which was adopted by all parties by stipulation and amendment of pleadings. The stipulation provided for the appointment of three engineers and two business men, each eminent in his calling, to investigate, determine and report to the court matters submitted to them, with such further information as might be useful to the court. Commissioners of the character indicated were appointed and the following specific matters were referred to them:

"(a) In the interests of protection from damage by flood waters, economy in the expenditure of public money, having in mind both present and future conditions as they may arise, including the requirements of the traveling public, and the use which said structure is to be placed and designated to carry out, what change, modification, alteration, destruction, reconstruction, or repair should the Twelfth street bridge, in Kansas City, Kansas, suffer or undergo or be done to afford proper safeguard and protection against flood waters, and for the proper and safe use of said bridge by the traveling public? In response to this question, state fully, accompanying same with plans, specifications, detailed drawings, blue prints and all things and matters necessary to be done as a prerequisite to the letting of a contract for the furnishing materials, doing the work of reconstruction, repair or alteration which you recommend to be done.

"(b) What the probable estimated cost of the doing of the work, the furnishing the materials, and so forth, including the use of such materials derived from the present structure as you may recommend should be done, to remove all or any part of the structure as it now stands, and the building, repairing, constructing or reconstructing of such new or modified structure as you recommend?

"(c) What, if anything, is the interest of the Kansas City Railways Company in the present bridge construction, and what sum of money, if anything, would be awarded that company, or its receivers, on account of such destruction, change, reconstruction or repair of said bridge as you recommend in your report should be done, including the right to use any part or portion of said old structure used or to be used in the new or modified structure?"

The stipulation contained the following:

"It is further stipulated and agreed, all parties hereto consent, agree and pledge themselves, in all good and full faith, to make such orders, adopt such rules and resolutions, and take such steps as may be necessary to carry out and perform the work of changing, modifying, tearing down, constructing or reconstructing anew said Twelfth street bridge as shall be recommended in

the report of said commission herein provided for, and as said report by decree of this court shall stand approved and confirmed."

After thorough investigation and careful consideration, the commissioners made a complete and detailed report. The bridge as it stood afforded a twenty-foot roadway, but was defective, and it was necessary to replace the end spans. The commissioners recommended new spans forty feet wide at the north and south ends of the bridge, and reconstruction of the remainder of the bridge to afford a forty-foot roadway, using the existing spans in the reconstruction. The recommendation took into consideration flood protection, present and future conditions, including needs of the traveling public and the economical expenditure of public money. The court approved the report of the commissioners and entered a decree for alteration and reconstruction of the bridge as recommended. The decree included findings of facts essential to jurisdiction of the drainage board to order such reconstruction, and of facts essential to jurisdiction of the county board to comply with the drainage board's order. It was specifically found and adjudicated that bonds of the county were authorized and should be issued to pay for the work, without a bond election. The decree was entered on February 10, 1923, and on February 15 the county board adopted a resolution providing for reconstruction of the bridge according to the decree. On February 5, 1924, pursuant to an order of the drainage board, and pursuant to the decree, the county board adopted another resolution providing for reconstruction of the bridge. On April 1, 1924, contracts for reconstructing the bridge were let. The bonds in controversy were then duly issued and sold.

While the injunction suit was pending in the federal court, and before final decree, the drainage board prosecuted to judgment against the county board an action of mandamus to compel compliance with the drainage board's order, made in 1920, to build a new bridge. This court reversed the judgment in February, 1922. (*Drainage District v. Wyandotte County*, 110 Kan. 566, 204 Pac. 723.) In the opinion the court said:

"The only basis for the power of the drainage district board to maintain this action is to secure compliance with its order to remove the old bridge or so much of it as obstructs the flow of water and tends to increase the flood hazard. But whether the old bridge or any part of it has that tendency, and whether the order to remove that obstruction by the demolition of the bridge in whole or in part is reasonable, is a question which inheres in the suit in

the federal court, nor can it otherwise be determined so long as the federal court retains jurisdiction. . . .

"If the order of the drainage board for the removal or reconstruction of the bridge or any part of it to eliminate or minimize the flood hazard caused thereby was a reasonable order, the temporary restraining order of the federal court will eventually be dissolved. If the order was not reasonable, that matter will be judicially determined. . . .

"Until the validity of the drainage board's order is adjudicated to a conclusion in the court having jurisdiction of that matter, the duty of the county board, if it has any duty touching this bridge, should neither be directed nor controlled by mandamus." (pp. 572, 573.)

It appears that while the injunction suit was pending and undetermined the federal court was not averse to instruction from the state courts relating to interpretation and application of the state's laws, and on April 12, 1923, a suit was commenced in the district court of Wyandotte county to obtain a declaratory judgment respecting authority of the drainage board and of the county board in the premises. The board of county commissioners was plaintiff, and the drainage board, the city of Kansas City, Kan., and the railways company were defendants. On May 29, 1923, the court rendered judgment that the contemplated reconstruction of the bridge was within purview of the statutes referred to, that the county board could issue bonds to build the bridge without an election, that the county board could build the bridge regardless of original title to the structure, and that the entire matter had been adjudicated by the United States district court. No appeal was taken from this judgment.

Previous to the time the declaratory judgment was rendered the state of Kansas had not participated in any of the litigation pertaining to the bridge. On June 2, 1923, the state of Kansas, on the relation of the county attorney of Wyandotte county, applied to this court for a writ of mandamus to compel the county board to reconstruct the bridge and to issue bonds to pay for the work without calling an election. The city of Kansas City and the drainage board joined in the application. The application contained a history of the controversy, exhibited a copy of the decree of the federal court, and contained the following:

"That said decree was rendered with jurisdiction over all of the parties to and the subject matter of said suit. That no appeal has been taken, or attempted to be taken, from said decree by any of the parties. That said decree and all of the provisions thereof are final, valid, and in full force and effect.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"That the said decree of the United States district court of date February

10, 1923, hereinbefore set forth, is a final and conclusive adjudication and decision; that it is the duty of the board of county commissioners of Wyandotte county, Kansas, to repair, alter and reconstruct said Twelfth street bridge in the respects, manner and plan set forth in said decree, and that said board of county commissioners has full authority to, and that it is the duty of said board of county commissioners to issue bonds of the said county of Wyandotte, without any election, to provide for the repair, alteration and reconstruction of said Twelfth street bridge in accordance with said decree.

"That the plaintiffs do not waive, but expressly rely upon, assert and plead the said decree and proceedings of the United States district court as a final, valid and conclusive adjudication as to the power and duty of the board of county commissioners to repair, alter and reconstruct said Twelfth street bridge in accordance with said decree and to issue the bonds of Wyandotte county to provide therefor, without any election. . . .

"That by reason of the controversies and matters hereinbefore set forth, said bridge is not repaired, reconstructed or kept in a safe or adequate condition for public travel, and that it is a matter of general and great public importance that said bridge be reconstructed at once.

"Wherefore, the plaintiffs move the issuance of a writ of mandamus, commanding the board of county commissioners of Wyandotte county, Kansas, to forthwith reconstruct said Twelfth street bridge across the Kansas river in Kansas City, Kansas, in the manner and according to the plans set forth in the said decree of the United States district court, and to issue bonds of said county to pay therefor without any election, and do all other acts and things necessary to the reconstruction of said bridge."

The application was in effect one for a writ of mandamus from this court to enforce the decree of the federal court. The federal court was competent to enforce its own decree, and the action was dismissed.

On June 7, 1924, the board of county commissioners commenced an action of mandamus in this court to compel the state auditor to register the bonds. The attorney-general of the state appeared for the auditor, and filed a motion to quash the alternative writ. On July 14 a brief was filed by counsel acting as friends of the court, which was refiled on October 6 by the state as its brief in this action. On September 25, 1924, a stipulation to dismiss the action, and consent of the attorney-general, representing the auditor, to dismissal, were filed, and on the same day the action was dismissed.

The action is one of quo warranto, and the declaration sought is that the board of county commissioners acted in excess of its corporate powers in issuing the bonds. In this state an action of quo warranto is a civil action. It may be brought by the attorney-general or by the county attorney in the name of the state, or, under certain circumstances, by a private person in his own name.

Whether or not an action shall be commenced rests with the officer or person authorized to sue. A petition may be filed and summons may be issued as in any other civil action, and the courts have no discretion in the matter. When an action has been commenced and the cause of action is before the court for adjudication, the court has discretion to grant or withhold relief, and this is true whether the action be prosecuted in the name of the state or in the name of a private person. In this respect the state comes into court on equal terms with its citizens. Quo warranto is still an extraordinary remedy, and will not lie when other adequate remedy exists. (*The State, ex rel., v. Wilson,* 30 Kan. 661, 2 Pac. 828.) Even although there be departures from legal limitations and standards, ouster does not mechanically follow. The court may take a broad view of motives, conduct, situations and circumstances, and of the ultimate consequences of application of the remedy, whether useless, beneficial or harmful. (*The State v. Bowden,* 80 Kan. 49, 101 Pac. 654; *Yeager v. Aikman,* 80 Kan. 656, 103 Pac. 132; *Little v. Davis,* 80 Kan. 777, 104 Pac. 560; *The State v. Kennedy,* 82 Kan. 373, 108 Pac. 837; *The State, ex rel., v. Stewart,* 90 Kan. 778, 135 Pac. 1182; *The State, ex rel., v. Cannon et al.,* 116 Kan. 325, 328, 226 Pac. 777; *Weston v. Lane,* 40 Kan. 479, 20 Pac. 260.)

In other states it has been held that the court may, in the exercise of its discretion, take into consideration the position and motives of the relator, the interest or policy of granting the remedy, the public interest, convenience, or detriment, the prospect of strife, confusion and litigation, and unreasonable delay or acquiescence of the complaining party. The state itself may be denied relief when there has been long acquiescence or recognition. *The People v. Hepler,* 240 Ill. 196; *The People v. Lease,* 248 Ill. 187; *State of Iowa v. City of Des Moines,* 96 Iowa, 521; *Attorney-general v. MacDonald,* 164 Mich. 590; *State v. Nohle et al.,* 16 N. D. 168.)

The petition contains no charge of fraud, collusion or corruption, and good faith of the board of county commissioners is not impugned. The charge is lack of corporate capacity to issue the bonds. Authority of the board is challenged with respect to some matters which raise quite simple questions of statutory interpretation, not in themselves of sufficient gravity to induce the court either to give or to withhold a declaration concerning them. The question of importance is whether the board of county commissioners is clearly undertaking such an improvement of the bridge that the board departs

from the authority conferred by the flood-protection statute, and brings itself within the restrictions of the general law, which requires a bond election and places a limit upon bonded indebtedness of the county. This question has been adjudicated by the federal court and by the district court of Wyandotte county, but the state challenges jurisdiction of the federal court and insists further that because it was not a litigant it is not bound by the judgment of either court. Shall this court now interfere?

The brief filed by the state was prepared by counsel who frankly stated they represented taxpayers who pay a considerable portion of the taxes of Wyandotte county. Presumably the county attorney used the name of the state in their behalf. At the very inception of proceedings involving reconstruction of the bridge, a taxpayer, the Kansas City Railways Company, instituted an action to prevent improper exercise of the county board's corporate power. Almost five years have elapsed. Throughout the period, one event after another has occurred strengthening the likelihood that expensive reconstruction of the bridge would take place. Although privileged by statute to do so (R. S. 60-1121), the taxpayers now moving have neither taken independent action to protect their interests nor intervened in any of the suits wherein legality of the county board's action was questioned. Contracts for construction of the bridge have been let, which are valuable to the contractors because of reduction in price of material. The bonds have been registered and sold, and the contract of sale is valuable to the purchaser because of the condition of the bond market. The stipulation for dismissal of the auditor's case, signed by attorneys who now represent the purchaser of the bonds, recited that the purchaser had agreed to take the bonds without any adjudication respecting their validity. He was about to tender the price and demand delivery when this action was commenced. The relief sought does not prevent delivery of the bonds to the purchaser, or prevent the purchaser from transferring them to innocent purchasers, against whom taxpayers, in their capacity as such, would be remediless. The result is the usual result of laches in matters of moment and magnitude—confusion complication and embarrassment, and balancing all the probabilities, doubt of ultimate outcome.

Regarding the action as one in the general public interest, the state has assumed inconsistant positions before this court regarding that interest. A little more than a year ago the same county attorney who brings the action was here petitioning the court, in the name of

the state, for a writ of mandamus to compel the county board to do what he would now oust them from doing. When action was first taken pointing to the result now impending, the state stood aloof. It did not intervene in the suit in the federal court, and it petitioned for no review of the decree entered in that suit. It did not intervene in the suit in the district court of Wyandotte county, which resulted in a judgment intended as a basis for the bond issue, and suffered the judgment to become final. The attorney-general of the state represented the state auditor in the suit brought to forbid registration of the bonds, and consented to dismissal. The court is not deciding that the state of Kansas is bound by laches of its officers, neglect to improve opportunity for relief by usual methods, election, or inconsistency of conduct. The court does decide that the peculiar if not bewildering conduct of the state is a matter to be considered in determining whether the court should proceed to judgment on the merits.

In addition to the interest in regularity of conduct on the part of public officers, and the consequences resulting from unauthorized conduct, another public interest of very great if not surpassing importance must be considered—the interest in conservation of life and property. The court must depend on the record for information respecting physical conditions out of which the controversy arose. The most authentic information it possesses is contained in the decree of the federal court, which includes the following findings of fact:

"The court further finds that the present steel trestle approach 270 feet in length at the northerly end of the present Twelfth street bridge, together with the piling, pedestals, columns and all parts thereof, constitutes and is a wrongful obstruction in the channel of the river at said bridge; that it prevents the deepening and improvement of the channel; that said steel trestle approach is so constructed and maintained as to materially reduce the capacity of the river to carry its waters at times of floods and high water therein and endanger the levees of the Kaw Valley drainage district along the banks of the Kansas river, and the safety and lives of people residing and doing business in said district, and of all property situated therein.

"The court further finds that the piers of the said Twelfth bridge as now constructed and maintained are unsafe and inadequate, are liable to be undermined in times of floods or high water in the Kansas river, and constitute, and are as now maintained, wrongful and dangerous obstructions in the channel of said river.

"The court further finds that it is necessary, in order to secure an adequate channel for the Kansas river, of sufficient capacity to carry the waters of the Kansas river at said Twelfth street bridge, and to make said bridge safe as

11—117 Kan.

against high water and floods such as frequently occur in the Kansas river, to change, alter and reconstruct said Twelfth street bridge in the respect specified in and according to the report, plans and specifications of said commission; and

"The court further finds that it is necessary and proper, in order to secure adequate flood protection, to alter and reconstruct the superstructure of said bridge and the approaches thereto in accordance with the said report, plans and specifications of said commission. ·

"The court further finds that the northerly steel trestle approach of said present Twelfth street bridge as now constructed and maintained, and the viaduct span of said bridge extending across the tracks and right of way of the Atchison, Topeka & Santa Fe Railway Company. at the southerly end of said bridge as now constructed and maintained, are insufficient, dangerous, and may fall into the river, and thereby obstruct the natural flow of the water in the river, and that the superstructure of the main spans of said bridge is also inadequate and unsafe for public travel, and that said bridge as a whole is unsafe in each and all of the respects specified and shown by the report of said commission, and as now maintained constitutes and is a public nuisance, which it is the duty of the board of county commissioners of Wyandotte county to abate by altering and reconstructing the same as provided in the aforesaid report, plans and specifications of said commission, and that said county is authorized and required to issue bonds for the alteration and reconstruction of said bridge in the manner and respects provided in said report, without the same being authorized by any election."

A declaratory judgment is prayed for. The court has jurisdiction to make a declaration of right only because it could grant consequential relief if such relief were prayed for. After declaration, further relief may be demanded (R. S. 60-3129), and the case is to be regarded in the same light as if the county board were to be ousted from exercise of assumed authority to deliver the bonds, under sanctions likely to make the ouster effective. If the court should now proceed to judgment on the merits, and should conclude the bonds were wrongfully issued, intolerable consequences would necessarily result. The court would be placed in antagonism to the federal court, which has decreed that the bonds shall be issued, and this, too, after twice indicating that the federal court, already in full possession of the controversy, was capable of dealing with it.

Without pursuing the subject further, the court concludes that, under the circumstances stated, it would be highly improper for it to make a binding declaration of right in respect to the matters in controversy, and, exercising its judicial discretion, it declines to do so. The restraining order heretofore issued is set aside, and the action is dismissed.