No. 36,023

THE STATE OF KANSAS, ex rel. J. W. DALTON, County Attorney of Chautauqua County, *Appellant*, v. THE JOINT GRENOLA RURAL HIGH SCHOOL DISTRICT No. 6 of the Counties of Chautauqua, Cowley and Elk, et al., *Appellees*.

(142 P. 2d 695)

Opinion filed November 6, 1943.

*Payne H. Ratner*, of Wichita, argued the cause, and *J. W. Dalton*, county attorney, and *Donald C. Allen*, of Wichita, were on the briefs for the appellant.

*Chester Stevens*, of Independence, and *Laurence M. Turner*, of Moline, argued the cause for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action to have an adjudication that the organization of the Grenola Rural High-school District No. 6 in the counties of Chautauqua, Cowley and Elk was null and void, and to enjoin the members of its district board and the county clerk and county treasurer from levying, certifying and extending on the tax rolls any tax levy for the support of the challenged school.

The basis of the state's attack upon the organization of the district was the want of strict conformity with every initiatory step prescribed by the statute for its creation.

The pertinent statute, in part, reads:

"The legal electors residing in a territory containing not less than sixteen

square miles shall have authority to form a rural high-school district whose boundaries shall have been approved by the county superintendent of public instruction and by the board of county commissioners of each county in which any part of such proposed district shall be situated, or by the state superintendent of public instruction in case the county superintendents and boards of county commissioners of two or more counties shall fail to agree on the approval of the boundaries of the proposed district, and to establish, locate and maintain therein a rural high school as hereinafter provided, . . ." (G. S. 1941 Supp. 72-3501.)

The material evidence, about which there was not much dispute, was to this effect: Late in the year 1942 certain persons living near Grenola, in Elk county, formed themselves into a committee of proponents and set about the preliminary tasks of getting a joint rural high-school district created out of parts of Chautauqua, Elk and Cowley counties. This committee presented their proposal to the county superintendents of Elk and Cowley counties. Those two officials gave the project their approval. The committee also presented their proposal to the boards of county commissioners of those two counties and both those boards likewise approved it. The committee also submitted the proposed organization to the county superintendent of Chautauqua county and that officer disapproved it.

The members of the county board of Chautauqua county were J. M. Mills, chairman, J. B. Miller and Homer Appleby. The suggested boundaries of the proposed district included certain lands in the locality where Miller resided. A committee of the proponents called on Miller at his home and stated the substance of their proposal. He told them that it was a matter which should come before the board, and that they could meet with the board on Wednesday, December 23. However, on Tuesday, December 22, the county superintendent of Chautauqua county, who apparently was aware of that arrangement, telephoned to the county superintendent of Elk county, one of the proponents, that the Chautauqua county board had already met, to which the Elk county superintendent said, "Surely not; we were to meet with them tomorrow." The Chautauqua superintendent replied, "I called you so you would not make the trip."

Other evidence tended to show that the Chautauqua county superintendent, Mrs. Clara Eddie, had informally discussed the project with the members of the county board, and gave them to understand that she disapproved it. The members of the board also informally discussed the proposed organization but took no action—

except to avoid a meeting with the proponents of the proposed high-school district.

No further effort was made to bring the project before the Chautauqua county board for their approval or disapproval, nor did that board later take action thereon. On the assumption that the disapproval of the county superintendent of Chautauqua county and the inaction of the county board of that county created a situation which checked the matter up to the state superintendent of public instruction for his approval or disapproval under the terms of the statute quoted above, the proposed organization was submitted to him. The state superintendent set the matter for hearing on February 19, 1943, at his office in Topeka. Certain proponents and opponents of the high school attended that meeting and were given a hearing. Commissioner Miller, who in the meantime had become chairman of the county board, planned to attend the meeting, but was prevented by another engagement, and at his request Commissioner Appleby attended in his stead. While there is a dispute as to what he said at that meeting, the assistant state superintendent, who presided, testified that—

"Mr. Appleby was at the hearing and made a fairly long statement; . . . Mr. Appleby said that the representatives present at the appeal hearing from Chautauqua county were in opposition to formation of the district."

Several other witnesses testified that such was the substance of Commissioner Appleby's statement at the Topeka meeting in the state superintendent's office.

The state superintendent gave his approval to the boundaries of the proposed district, following which an election was called and the electors by a large majority voted to create the district. Then followed the election of a director, clerk and treasurer for the district, and its organization was thus effected and ready to function.

On June 1, 1943, this action was begun to challenge the validity of the organization of the district, stressing particularly the fact that the board of county commissioners had neither approved nor disapproved the boundaries of the proposed district.

The cause was heard at length and the material facts as narrated above were developed by the pleadings and evidence.

The trial court made findings of fact and conclusions of law, too lengthy for repetition here, but the facts found were substantially as summarized above. The court's principal conclusion of law read:

"FIRST

"Although the matter of the boundaries of the proposed rural high school was never submitted to the board of county commissioners of Chautauqua county as a board, yet the individual members of the board knew the proposed boundaries, were opposed to said boundaries and were opposed to including in said boundaries any lands in Chautauqua county, and so expressed themselves before the matter was submitted to the state superintendent. It would have been useless for the proponents of the proposed district to have presented the matter to the board as a board. If the proposed boundaries had been submitted to the board as a board, such boundaries would have been disapproved.

"This was sufficient to comply with the statute, and at the time the matter was presented to the state superintendent both the county superintendent and the county commissioners of Chautauqua county had failed, within the meaning of the statute, to agree with the county superintendents and the board of county commissioners of Elk and Cowley counties, and the state superintendent had jurisdiction to hear and determine the matter of the boundaries."

Judgment was accordingly rendered for defendants, and the state appeals.

Counsel for the state stress the necessity of a formal approval or disapproval of the proposed boundaries of the projected rural high-school district by the Chautauqua county board of county commissioners as one of the conditions precedent to confer on the state superintendent the authority exercised by him under G. S. 1941 Supp. 72-3501.

That technical point would ordinarily have to be conceded, for as a matter of course as well as a matter of law, a preliminary consideration of the project to create the high school by each county superintendent and each board of county commissioners in any way concerned with the matter was both desirable and proper. Doubtless the lawmakers' idea was that the school superintendents of the counties affected should have an opportunity to consider the merit of the proposed organization from an educational standpoint, and that the county boards should be consulted, since they are the chief fiscal authority of the county, and may be presumed to know the taxpaying capacity of the property owners of the proposed district. But it should not be overlooked that the limit of the county board's authority under the statute is to approve or disapprove the boundaries, not to block the project altogether by inaction; and it cannot be said that the attitude of the Chautauqua board was ever a matter of doubt after the proponents of the district were prevented from

presenting the proposed organization to the board for its approval or disapproval on the arranged date of December 23.

Indeed, when Commissioner Appleby appeared before the state superintendent at Topeka to urge his own and Commissioner Miller's objections to the proposed boundaries of the district, he never intimated to the state superintendent the point which has since become the basis for challenging the validity of the organization in this litigation. If the point now stressed had then been made that the proposed district had never been presented to the Chautauqua county board and that the board had not had an opportunity to approve or disapprove it, it would have been a simple matter for the state superintendent to suspend the hearing before him until the board could have been convened and the proponents given an opportunity to present the matter before it, which the failure of the board to meet on December 23 did prevent, irrespective of whose fault it may have been; after which the hearing before the state superintendent could have been reconvened and the matter disposed of with technical correctness. It was, of course, true that since the Chautauqua county superintendent had disapproved the project, and her attitude constituted such a failure to agree with the officials of the counties of Elk and Cowley as to its desirability, so as to require the matter to be remanded to the state superintendent for his appproval whether the county board should approve or disapprove it.

But ere this action was begun all the processes by which the highschool district could be called into existence, the popular election, election of the district officials, estimation of the requisite tax levy, and the hiring of teachers had occurred. So when this controversy became the subject of litigation before the district court, the existing status of the school district's affairs could not be overlooked by that court nor can it be overlooked by this court.

*Quo Warranto* in our time is not the ruthless and inexorable corrective for corporate irregularities that it was when it was used to wreck the ecclesiastical corporations of the middle ages, nor when the attorney general of England used it to forfeit the charter of the city of London. (*Rex v. City of London*, 8 Howell's State Trials, 1039.) It is no longer a writ of right with all its former drastic consequences. An act of Parliament in 1690 (2 W. and M. ch. 8), which forbade that the charter and franchises of the city of London should be forfeited thereafter for any cause whatsoever (Blackstone's Comm. Book III, 263) was a landmark of a new pub-

lic policy for dealing with possible defects in the corporate structure of public bodies.

In 44 Am. Jur. 96, it is said:

"Although originally the writ of quo warranto was a writ of right,,it is in modern times, and generally speaking, not of that character, but issues in the sound discretion of the court, even where the state is seeking the writ, and this discretion in regard to the proceeding is in some states recognized by statute. This is rightly so, for the writ, or a judgment of ouster thereunder, is one which may have drastic consequences affecting the public welfare. In exercising such discretion, the court may and should consider all the circumstances in the case, including lapse of time and circumstances which would establish laches, acquiescence, or estoppel, and whether the public interest will be served, for the court may refuse the writ or judgment of ouster upon considerations of public policy, interest, or convenience."

In our own early decisions some cases will be found which do not accord with the modern rule just quoted, as in *State, ex rel., v. Comm'rs of Garfield Co.*, 54 Kan. 372, 38 Pac. 559, with the deplorable consequences which afflicted that unfortunate territory for the next thirty years. A similar regrettable result, on a smaller scale, followed the decision of this court on a technical defect in the organization of the Gove county high school, in *State v. Bentley,* 80 Kan. 227, 101 Pac. 1073.

However, the modern view is that quo warranto is not a writ of right, and that a broad judicial discretion should be exercised in issuing or withholding it. This is fairly reflected in the pronouncements of this court throughout the last thirty years. Thus in *Albach v. Fraternal Aid Union,* 100 Kan. 511, 164 Pac. 1065, where the dissolution of a merger of two fraternal insurance corporations was sought on the alleged ground that there had been defects in the proceedings leading up to their merger, this court held that plaintiffs did not have sufficient personal interest in the challenged merger to maintain the action, but the court also cited two of our own earlier decisions where the ouster in quo warranto had been withheld simply on the basis of judicial discretion. The court said:

"In the facts alleged and the relief prayed for in this action the proceeding in effect is quo warranto. Except in most unusual cases, such an action can only be maintained in the name of the state by its proper legal representative —the attorney-general, or, perhaps, by the county attorney. And even if so maintained, the relief to be given is to some extent discretionary with the court. (*City of Topeka v. Water Co.,* 58 Kan. 349, 353, 49 Pac. 79.) Where, as most likely in the case at bar, the result would be to wreck an institution that is doing a beneficial and humanitarian work notwithstanding some possible defects in its financial or economic structure, the state's responsible legal rep-

resentative should consider well whether such action should be instituted (*The State v. Bowden,* 80 Kan. 49, 56, 57, 101 Pac. 654), and the court would consider with profound solicitude whether the remedy prayed for was not worse than the evil complained of." (p. 517.)

In *State, ex rel., v. School District,* 113 Kan. 441, 215 Pac. 453, the state brought quo warranto to set aside the organization of a rural high-school district on two grounds, one of them being that the boundaries of the school district had not been approved by the board of county commissioners before the petition for calling the election, with the requisite statutory recitals, was presented to the board for their official action. The trial court and this court held that the defect was a mere irregularity which was insufficient to require the court to set aside the school district organization, even in an action brought by the state itself.

In *State, ex rel., v. Wyandotte County,* 117 Kan. 151, 230 Pac. 531, the action was in quo warranto challenging the validity of certain proceedings of the board of county commissioners relating to an extraordinary issue of bridge bonds. The court declined to make a binding declaration of right, justifying its attitude on the ground that the case was one for the exercise of judicial discretion. In the course of the opinion, it was said:

"The action is one of quo warranto, and the declaration sought is that the board of county commissioners acted in excess of its corporate powers in issuing the bonds. In this state an action of quo warranto is a civil action. . . . When an action has been commenced and the cause of action is before the court for adjudication, the court has discretion to grant or withhold relief, and this is true whether the action be prosecuted in the name of the state or in the name of a private person. . . . Even although there be departures from legal limitations and standards, ouster does not mechanically follow. The court may take a broad view of motives, conduct, situations and circumstances, and of the ultimate consequences of application of the remedy, whether useless, beneficial or harmful. (Citations.)" (pp. 158, 159.)

In the case of *State, ex rel., v. Allen County Comm'rs,* 143 Kan. 898, 57 P. 2d 450, where the validity of the Allen county road unit system was questioned in quo warranto, this court squarely faced the situation presented by the state—that the election to establish the road unit system had been called and held without the requisite statutory official notice having been given. The court declined to meddle with the road unit system thus adopted. In the opinion by Mr. Justice Wedell it was said:

"While we cannot approve the lack of official notice for the election, there is presented to this court a very vital and practical question of public in-

terest. Of the 7,311 votes cast on the question, 3,960 voters favored and 3,351 voters opposed the adoption of the new system. The county commissioners are at least *de facto* officers in relation to the present management and operation of the county road system in Allen county. Under all the circumstances, would the ouster of the commissioners from the exercise of such *de facto* powers serve any good end or purpose? This is an original action in quo warranto. The question is in a large measure addressed to the sound discretion of this court. (Citations.)" (p. 902.)

It would appear that the decision just cited had the effect of overruling the decision in the Gove county high school case, *State v. Bentley*, supra, some thirty years ago.

In the yet more recent case of *Gas Service Co. v. Consolidated Gas Utilities Corp.*, 145 Kan. 423, 65 P. 2d 584, the same attitude was taken by the court in refusing to oust a gas company from the streets it had been occupying without full legal right thereto. Speaking for the court in that case, Mr. Justice Smith said:

"An action in quo warranto is addressed to the sound discretion of the court as to whether the particular relief prayed for should be granted. In consideration of such a question the court considers all the surrounding facts and circumstances. The relief prayed for is not always granted even though the questions of law upon which the relief prayed for depends are decided in favor of plaintiff." (p. 437.)

We think the instant case should be similarly disposed of. Although we neither would nor could countenance a course of conduct on the part of the proponents of the rural high-school district if they had simply ignored the board of county commissioners of Chautauqua county, yet here there is not the slightest doubt that in good faith the proponents sought to have the matter presented to that board. And, as we have said, it was not the privilege nor the prerogative of the county board to effectually block the creation of the high school. It could approve or disapprove it—no more. While technically, as a board, they did neither, yet that the members of the board did disapprove it was too clear for cavil; and under all the circumstances it would be entirely at variance with the precedents of this court for the last thirty years to declare the district void now, and thus erase all that has been done to establish it and put its school in operation, and to require the idle repetition of the whole procedure again, merely to obtain the formal disapproval of the project by the Chautauqua county board of commissioners.

The judgment of the district court is affirmed.