The State, *ex rel.*, v. Grove.

No. 23,612.

THE STATE OF KANSAS, ex rel. RICHARD J. HOPKINS, Attorney-general, *Plaintiff*, v. CHARLES E. GROVE, *Defendant*.

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW — *Statute Authorizing Declaratory Judgments Constitutional.* A statute authorizing the rendition of merely declaratory judgments is not unconstitutional on the ground of attempting to confer nonjudicial power upon courts. Such judgments may be judicial acts although rendered in actions admittedly brought before a right has been invaded, and although no consequential relief is given or sought.

2. RAILROAD CORPORATION—*Operating Under City Franchise—Employee Disqualified to Hold Office of City, Commissioner.* Where a railroad company uses certain streets and alleys in a city under ordinances granting it the right to occupy them with its tracks upon condition that it shall conform to certain requirements, including the keeping the track in good condition with respect to general travel, the paving of the track between the rails, and the maintaining of a driveway and sidewalk for the public, one who is employed by such company as a boilermaker is disqualified to hold the office of city commissioner, under the statute which provides that no employee of a railway corporation operating under a franchise granted by a city, or having any contract with it, shall hold any city office. The term franchise is used in such statute in a broad and general rather than a narrow and technical sense, and covers rights acquired under such ordinances, and the relations of the city and railway company under such ordinances are contractual.

Original proceeding in quo warranto. Judgment for plaintiff, June 27, 1921. Opinion filed October 8, 1921.

*Richard J. Hopkins*, attorney-general, *J. K. Rankin*, and *E. W. Clausen*, assistant attorneys-general, for the plaintiff.

*Robert C. Foulston*, and *George Siefkin*, both of Wichita, for the defendant.

The opinion of the court was delivered by

MASON, J.: This proceeding was brought by the state on the relation of the attorney-general for the purpose of determining the legal capacity of Charles E. Grove, the defendant, to hold the office of member of the board of commissioners of the city of Wichita, to which he had been declared elected on the can-

vass of the returns. The case was submitted on the pleadings, the facts not being in dispute, on June 10, 1921. It being suggested that the interest of the public required an early determination of the matter, the court, having reached the conclusion that the defendant was ineligible to the position, announced its decision to that effect June 27, with the statement that an opinion would be written later.

The defendant is in the employ of the Missouri Pacific Railroad Company, and the claim of disqualification is based upon the statute which forbids an employee of a railway company operating under any franchise granted by the city or having any contract with it to hold any city office, and imposes a penalty of both fine and imprisonment for doing so. (Gen. Stat. 1915, § 1556.) Inasmuch as the defendant had not attempted to enter upon the discharge of the duties of the office the proceeding against him was brought under the provisions of the law enacted at the recent session of the legislature authorizing the rendition of declaratory judgments (Laws 1921, ch. 168), the constitutionality of which is challenged by the defendant. The questions to be determined are whether the declaratory judgment statute is valid, whether the railway company is operating under a "franchise" granted by the city within the meaning of that term as used in the statute concerning the qualifications of city officers, and whether the company has a contract with the city.

1. A statute authorizing declaratory judgments has recently been held unconstitutional. (*Anway v. Grand Rapids Railway Co.*, 211 Mich. 592.) The proceeding in which the decision was rendered was not based upon an actual controversy. The members of the court appear to have agreed that for this reason it could not be maintained. A majority of the justices, however (two out of eight dissenting and another limiting his concurrence to the result reached), treated the proceeding as one of the kind the legislature intended to authorize, but held the statute invalid because the power to make a declaration of rights, where no consequential relief can be had, is not judicial, and cannot be conferred upon courts.

Whatever may have been the intention of the framers of the Michigan act in that respect, the Kansas statute is explicitly limited in its operation to "cases of actual controversy." (§ 1.)

The decision of the Michigan court that the proceeding there under consideration was not maintainable and should be dismissed appears to have turned upon the fact that (as in *Muskrat v. United States,* 219 U. S. 346, upon which case much reliance is placed) no actual controversy existed between opposing parties. The decision so far as it is based upon that ground is not inconsistent with the validity of the act here involved. In the majority opinion in that case, however, views were expressed that if accepted as sound would be fatal to the Kansas statute.

There is no occasion for a general discussion here of declaratory judgments—their purpose, the needs that give rise to them, the extent to which they have been employed and the results obtained. These matters have been fully covered by recent contributions to legal publications, most important among which may be mentioned those of Professor Edson R. Sunderland (16 Michigan Law Review, 69, December, 1917), and Professor Edwin M. Borchard (28 Yale Law Journal, 1, 105, November and December, 1918). The authorities bearing on the question of the constitutionality of such statutes have likewise been so fully collected and discussed in the majority and minority opinions in the Michigan case as to dispense with the necessity of reviewing them here. See also note, 12 A. L. R. 52, in which all aspects of the matter, including the constitutional question, are fully discussed. The first and sixth sections of the Kansas act contain its vital provisions—those against which the constitutional objections are directed. They read:

"In cases of actual controversy, courts of record within the scope of their respective jurisdictions shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for. Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations, may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right." (Laws 1921, ch. 168, § 1.)

"This act is declared to be remedial; its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordi-

nary action therefor; and it is to be liberally interpreted and administered, with a view to making the courts more serviceable to the people." (*Id.*, § 6.)

Against the validity of the statute it is urged that the occasion for judicial action cannot arise until a claim is made that an actual wrong has been done or is immediately threatened and moreover (what is much the same thing stated in another way) that a decision cannot properly be classed as a judgment—as a strictly judicial act—unless besides determining the merits of the controversy between the parties—deciding which is right—it affords (or denies) some additional remedy—in other words "consequential relief"; and therefore that power to decide a controversy in the absence of the conditions indicated is not judicial and cannot be conferred upon courts by the legislature. This view appears to us to be unsound and to be the result of confusing declaratory judgments with advisory opinions and decisions in moot cases, and perhaps also of an inclination to treat a general practice that has been long established as having acquired the force of a constitutional guaranty. A mere advisory opinion upon an abstract question is obviously not a judgment at all, since there are no parties to be bound and the rights of no one are directly affected. The situation is substantially the same where opposing parties present a moot question—one the decision of which can have no practical effect. Where a judgment is sought of such character as to be of no benefit unless accompanied by an order the carrying out of which is impossible the futility of the proceeding is a sufficient basis for a court's refusal to entertain it, whether or not jurisdiction to do so exists. But some judgments are wholly or in part self-operative. They perform a valuable function in and of themselves. It is often said that a cause of action arises only upon the breach of a duty—the invasion of a right. This, however, is merely the announcement of a general rule of practice subject to possible exceptions and to legislative change. Actions to quiet title and to construe wills are recognized methods of invoking judicial action which do not originate in the actual commission of a wrong nor terminate in a judgment inflicting a penalty, granting compensation or injunction, or otherwise giving "consequential relief," the declaration of rights being all that is necessary to fit the requirements of the case. The

decree in an action to quiet title is sometimes so drawn as to order the setting aside or cancellation of a deed. A declaration that the instrument is void and without effect amounts to the same thing. The judgment does not change the condition of the title but simply declares where it is vested. It gives the only relief that is necessary to settle the controversy—the determination of the ownership of the property. Why the legislature cannot authorize similar procedure in like situations to meet like needs is not apparent. It is hardly conceivable that any fundamental principle of our government, beyond legislative control, prevents two disputants, each of whom sincerely believes in the rightfulness of his own claim, but each of whom wishes to abide by the law whatever it may be determined to be, from obtaining an adjudication of their controversy in the courts without one or the other first doing something that is illegal (in the case of the present defendant criminal) if he is mistaken in his view of the law.

The mere judicial determination that one party to litigation is right in his contentions and his opponent wrong accomplishes in some instances all that he seeks and in others at least a considerable part of it; it conclusively and finally settles the question of liability between the parties. This is recognized in various expressions of the courts and text-writers, of which the following are illustrative: "But in general the office of a judgment is fully performed when it declares and adjudicates the existence or nonexistence of the liability sought to be established; it is not concerned with the means of enforcing the liability declared." (23 Cyc. 669.) "The first and most obvious consequence of a judgment is that it establishes an indisputable obligation and confers upon the successful party the right to issue execution or other process of the court for its enforcement. But this, it must be repeated, is not an integral part of the judgment. The judgment is merely the affirmation of a liability. The right to use the process of the court for its enforcement is a consequence which the law attaches to it. . . . The judgment, after performing its office of declaring the existence of a certain liability, leaves the party to pursue the remedies which the law provides." (1 Black on Judgments, § 4.) Where the plaintiff asks the recovery of money and his claim is held to be unfounded the defendant needs no injunction against its further prosecution. He is fully pro-

tected by a judgment explicitly or impliedly declaring it to be invalid. The maker of a note may sue before its maturity to have it canceled for fraud; a judgment declaring that it was fraudulently procured might answer the same purpose. In such an action the rendition of a judgment for the holder declaring the note valid would be an unquestioned exercise of judicial power. It would seem that if the holder, learning of a claim on the part of the maker that his signature was procured by fraud, should bring an action authorized by statute to have that matter determined, a decree in his favor declaring the note valid ought not to be a nullity on the ground of being nonjudicial.

Probably the strongest statement of the view against merely declaratory judgments is to be found in an opinion written by Chief Justice Taney where in arguing the invalidity of an act of congress authorizing an appeal to the supreme court from a decision of the Federal court of claims, he said:

"The award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power. It is no judgment, in the legal sense of the term, without it. Without such an award the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. It would be merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties, unless Congress should at some future time sanction it, and pass a law authorizing the court to carry its opinion into effect. Such is not the judicial power confided to this Court, in the exercise of its appellate jurisdiction; yet it is the whole power that the Court is allowed to exercise under this act of Congress." (*Gordon v. United States;* Appendix to 117 U. S. 697, 702.)

This opinion was not that of the court, nor does it appear to express correctly the grounds of the court's decision. The case to which it applies was first submitted in December, 1863, and was reargued at the December term, 1864, when it was decided. (*Gordon v. United States*, 69 U. S. 561.) In the meantime Chief Justice Taney had died, and the copy of the opinion from which the publication in the appendix referred to was made was produced years afterwards by the son of his executor. The actual grounds of the decision as shown by the language of Chief Justice Waite in announcing it (quoted in *United States v. Jones,* 119 U. S. 477, 478) seem to have been the same as those upon which *The United States v. Ferreira,* 54 U. S. 40, was based, namely, that under the statute as it

then existed a decision of the court of claims was merely advisory—was not intended to amount to an adjudication, was not a judicial act, and therefore the provision undertaking to allow an appeal to a court therefrom was invalid. The Jones case just cited held that (the statute having been amended) an appeal to the supreme court of the United States could then be given from a decision of the court of claims allowing a demand against the government. That necessarily involved a ruling that such a decision may be a judicial act, notwithstanding the tribunal rendering it is without power to enforce it, because no money can be drawn from the Federal treasury but in consequence of appropriations made by law, and for that reason a court cannot enforce a money judgment against the government. "Hence the party who gets a judgment must wait until Congress makes an appropriation before his money can be had." (*Railroad Co. v. Alabama,* 101 U. S. 832, 835.) Congress can refuse to pay a claim which has been judicially determined to be valid, but this is a very different thing from having the power to set aside an award against the government, the reservation of which in congress or any other legislative or executive body would under the Ferreira case prevent the award from being final unless appealed from and therefore cause it to be nonjudicial.

In a case where the enforcement of an order of the interstate commerce commission requiring a carrier to cease a certain practice for two years from a stated time was enjoined, an appeal from the injunction was decided after the lapse of that period, over an objection that there was no longer anything upon which the decision could operate, the court saying:

"In the case at bar the order of the Commission may to some extent (the exact extent it is unnecessary to define) be the basis of further proceedings. But there is a broader consideration. The questions involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar) and their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review, and at one time the Government and at another time the carriers have their rights determined by the Commission without a chance of redress. . . .

"In *Boise City Irr. & Land Co. v. Clark,* supra, [131 Fed. 415] the period for which a municipal ordinance fixed a water rate expired pending the litigation as to its legality, and it was contended that the case had become moot. The court replied: 'But the courts have entertained

and decided such cases heretofore, partly because the rate, once fixed, continues in force until changed as provided by law, and partly because of the necessity or propriety of deciding some question of law presented which might serve to guide the municipal body when again called upon to act in the matter.' " (*So. Pac. Terminal Co. v. Int. Comm. Comm.,* 219 U. S. 498, 515, 516.)

In this jurisdiction the question at issue may be regarded as having been settled in *The State v. Allen,* 107 Kan. 407, 191 Pac. 476. There an appeal on the part of the state in a criminal case was sustained which was brought to determine the correctness of an instruction where no verdict had been reached, the jury having been discharged upon failure to agree. The difficulty resulting from the fact that no specific mandate for the doing or omission of any particular act could accompany the reversal was fully appreciated and considered but was held not to prevent the determination of the issue presented. The bearing of that case is not avoided by the fact that the state constitution (Art. 3, § 3) gives the supreme court "such appellate jurisdiction as may be provided by law" for the quoted clause does not contemplate its exercise upon appeal of any but judicial powers. (*Auditor of State v. A. T. & S. F. Railroad Co.,* 6 Kan. 500.)

A typical situation is presented for the application of the declaratory judgment act. There is a present controversy between the parties, the defendant claiming the right to perform the duties of the office to which he has been elected, and the plaintiff denying that right. The controversy is actual, not moot; concrete, not abstract. An interpretation of the statute concerning ineligibility is not the ultimate object of the suit but is a necessary step in determining whether the defendant is entitled to act as city commissioner. That question under the ordinary procedure could only be judicially decided after the defendant had assumed the duties of the office, thereby exposing himself to punishment by both fine and imprisonment. Even if injunction would lie to prevent his acceptance of the office, such relief would be unnecessary. In the remote contingency of his desiring to occupy the office after his ineligibility had been determined, the statutory penalty would exercise a sufficient restraining influence. The decision when announced is not merely advisory. It is a final adjudication having the binding force of any other judgment. If after its

being adjudged that the defendant is disqualified he should
undertake to hold the office, and the state should bring a pro-
ceeding to oust him, the only matter open to inquiry would be
whether he was actually holding it; he could not be heard
to raise any issue of either law or fact going to the question
of his eligibility—and this results from the principle of *res
judicata* and not from that of *stare decisis*.

2.  The statute which the plaintiff regards as rendering the
defendant ineligible reads as follows:

"No officer, employee, agent or servant or stockholder in any corpo-
ration, firm, company or person holding or operating under any fran-
chise granted by such city, including street and other railways, telephone
companies, electric-light companies or gas companies, or having any con-
tract with such city, shall hold any city office; and no officer or employee
of such city shall accept or hold any office in or employment by any
such corporation, firm, company or person seeking to acquire any such
contract or franchise; and any person violating any of the provisions
of this section shall thereby vacate his office and be fined not less than
five hundred dollars nor more than one thousand dollars, and imprisoned
in the county jail not less than six months nor more than one year."
(Gen. Stat. 1915, § 1556.)

The Missouri Pacific Railroad Company uses certain streets
and alleys in Wichita under ordinances granting it the right
to occupy them with its tracks on condition of its conforming
to certain requirements.  The defendant is employed by the
company as a boilermaker.  He contends that the rights ac-
quired by the company under the ordinances referred to are
not franchises within the meaning of the term as used in the
statute, and that the relations between the city and the com-
pany with respect thereto are not contractual.

It is said that legislative disqualifications to hold office are
strictly construed against the claim of ineligibility. (29 Cyc.
1380.)   Whether that be true otherwise than where the stat-
ute is penal or adds to requirements of the constitution need
not be determined.  The primary rule of construction is to
ascertain and give effect to the real purpose of the legislature,
and that will prove sufficient here.

The word franchise is often used in such sense as not to in-
clude the grant by a city to a railway company of a right of
way over its streets. (*M'Phee & M'Ginnity Co. v. Union Pac.
R. Co.,* 158 Fed. 5.)  This court, however, has held that "fran-
chise" in the quo warranto statute is to be interpreted as cover-

·ing a right of that character acquired in that manner. (*Olathe v. Railway Co.*, 78 Kan. 193, 96 Pac. 42.) The statute now under consideration refers explicitly to franchises granted by a city to railway corporations. The rights ordinarily given by a city to such companies are of the kind granted by the ordinances here involved. And inasmuch as the term "franchise" is a proper one by which to describe them the fair conclusion is that they are the sort of rights the legislature had in mind when it used the word.

The defendant also argues that if the rights granted by t⌐ ⌐ ordinances referred to are regarded as franchises they are vo⌐ ⌐ because of the provision of the statute limiting the duration of franchises granted by the city to twenty years, and making other requirements which have not been met. (Gen. Stat. 1915, § 1661, subdiv. 2.) The limitation appears to apply to contracts, grants, rights and privileges as well as franchises. The statute, however, contains a provision expressly excepting from its operation grants of "side-track or switch privileges to railway companies for the purpose of reaching and affording railway connections and switch privileges to the owners or users of any industrial plants." (Id., subdiv. 7.) Several of the ordinances in question contain express recitals showing that their grants are of that character, and in others that inference may reasonably be drawn.

Most of the ordinances by their terms required an acceptance by the railway company before becoming effective. The defendant, however, argues that no contract resulted because no obligations were imposed on the company and there was a want of mutuality. Provisions to the following effect are made in one or more of the ordinances. Under certain conditions the railway company is to pave the right of way in accordance with plans made by the city engineer; the company is to furnish such protection to the traveling public as the board of commissioners shall from time to time direct; the company is to maintain a driveway for the traveling public and a cement sidewalk by the side of a certain track or spur; the company is to hold the city harmless from claims for damages occasioned by its occupancy of the street; the city may compel the observance of the conditions laid down at any time it may elect. Some of the provisions relating to the conduct of the railway company may

Court of Industrial Relations v. Packing Co.

be mere expressions of legal obligations that would in any event be implied. But others are quite clearly contractual.

The defendant's disqualification results from the plain and unambiguous language of the statute. It is also as clearly within the purpose and spirit of the act. The legislature obviously proceeded upon the assumption that a corporation holding a franchise from or contract with the city, was likely by reason thereof to be drawn into controversy with it, and that a city officer who was required to take some action in relation to the matter, if he were an employee of the company in any capacity, might be influenced in his conduct by that circumstance. The provisions of the ordinances described are of such character that a dispute might readily arise out of conflicting interests, and the connection of a member of the commission with the company might prove an embarrassment. Whether that probability is strong enough to render it expedient to make such relationship an absolute disqualification is of course a matter for the legislature to determine.

For the reasons stated the judgment of the court has been rendered declaring the defendant disqualified to hold the office of city commissioner.