# Kariher's Petition (No. 1).

*Uniform Declaratory Judgments Act of June 18, 1923, P. L. 840
—Jurisdiction of courts—Common pleas—Orphans' court—De-
cedents' estates—Wills.*

1. Where an owner of limestone in land leases the same for a
term of years, with an option to the lessee to receive a new lease,
and after her death intestate, a son, and two grandsons, the latter
claiming under other sons of the lessor, agreed to execute a new
lease, and a dispute arises as to the legal right of one of the grand-
sons to execute the lease, the court of common pleas and not the
orphans' court has jurisdiction under the Uniform Declaratory
Judgment Act to pass upon such controversy inasmuch as the pro-
ceeding is not to enforce against the estate of the deceased lessor
specific performance of the option clause in the original lease, but
is a proceeding to have the legal right to contract by one of the
parties to the new lease, ascertained and declared.

*Constitutional law—Uniform Declaratory Judgments Act of June
18, 1923, P. L. 840—Nonjudicial duties—Denial of jury trial—Due
process of law—Allowable innovations—Moot cases—Res judicata
—Practice—Judicial discretion.*

2. The Uniform Declaratory Judgments Act of June 18, 1923,
P. L. 840, is constitutional, and, within proper limits, may be made
of real use.

3. The distinctive character of the declaratory judgment is that
the declaration stands by itself, that is to say, no executory process
follows as of course.

4. In order to obtain a declaration, it is not required that an
actual wrong should have been done, such as would give rise to an
action for damages, and no wrong need be immediately threatened,
such as would be a proper basis for an injunction. A present cause
of action is not essential.

5. A real controversy must, however, exist; moot cases will not
be considered; and the declaratory judgment is res judicata of the
points involved.

6. The fact that the declaration does not necessarily include the
right to execution, does not establish a nonjudicial duty which the
legislature cannot place upon the courts.

7. As the act merely permits a more general use of devices here-
tofore existing, such as quia timet actions, equity proceedings to
remove a cloud on title, proceedings to declare void bigamous mar-
riages, rules to bring ejectment, cases stated to determine market-

ability of title, etc., it cannot be said that the act is an unallowable innovation in Pennsylvania.

8. An ordinary judgment may or may not be followed by an execution, but as it always makes the issue at stake res judicata, and consequently makes the judgment forever enforceable, it is this feature rather than the fact that execution may or may not be issued, which gives it the character of a judgment.

9. The Uniform Declaratory Judgments Act does not involve an unconstitutional denial of trial by jury, inasmuch as section 9 provides for such trial in appropriate cases.

10. Nor does the act deny due process of law. It provides for jurisdiction by the court, that notice must be given, an opportunity to present one's case, a proceeding appropriate to the character of the particular case, and an adjudication of the same nature as is present in other cases. Where these things are present there is due process of law.

11. The declaratory judgment procedure offers another method by which a party can call on the courts to adjudicate his rights, but it is the same as existing methods in that it follows due process of law.

12. The legislature has power to change methods of procedure to create new forms, and remove restrictions against invoking court action.

13. In passing upon the validity of such legislation, courts do not fail to recognize that the law is a progressive science, that forms of procedure which at one time were regarded as essential may no longer be necessary, and that charges may validly be made.

14. In declaratory judgment practice, it is a matter of judicial discretion whether or not jurisdiction will be taken of any particular case, that a proceeding to obtain such a judgment will not be entertained where the court lacks jurisdiction of the subject-matter involved, or where another statutory remedy has been specially provided for the case in hand, and that jurisdiction will never be assumed unless the tribunal appealed to is satisfied that an actual controversy, or the ripening seeds of one, exists between the parties, all of whom are sui juris and before the court, and that the declaration sought will be a practical help in ending the controversy.

15. Furthermore, the court will not decide future rights in anticipation of an event which may not happen, but it will wait until the event actually takes place, unless immediate decision is necessary, in order to determine present rights and even then such rights will not be determined unless all parties concerned are present and ready to proceed in the case, so that the judgment rendered will make the issues involved res judicata in the full sense of that term.

*Wills—Construction—Intestacy—Devise to son—Remarriage of son—Exclusion of son's wife—Alternative limitation—Life estate —Vested remainder.*

16. Where a testator gives a life estate in land to his son, and at the son's death gives a life estate, or an estate during widowhood, in an undivided interest in the land to a possible second wife of the son if the son should remarry and leave a second wife at his death, and upon the death of the possible second wife, or upon the death of the son leaving no second wife, then to the son's children, and in default of such, over, the son takes a life estate only.

17. The provision over is an alternative limitation to take effect at the time stated, if there is a failure of issue of the son.

18. In such case it is immaterial that the son had a wife separated from him but living at the date of the will, and expressly excluded by testator from any share in the estate, and that he reunited with his wife after testator's death.

19. A grandson of testator being the child of such wife, possesses a vested remainder subject to open and let in other after-born brothers and sisters, and also subject to be defeated by his death without issue prior to the decease of his father, and to postponement in part as to its enjoyment by his parent leaving surviving him a second wife.

Argued October 9, 1925. Appeal, No. 146, March T., 1925, by G. W. Johnson Limestone Co., from order of C. P. Lawrence Co., June T., 1924, No. 35, dismissing exceptions to findings and order in proceedings under the Uniform Declaratory Judgments Act In re Petition of Orie M. Kariher for decree declaring rights under will of Terhan H. Kariher, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Reversed.

Petition under the Uniform Declaratory Judgments Act. Before EMERY, P. J.

The opinion of the Supreme Court states the facts.

Decree declaring rights under will of Terhan H. Kariher, deceased. G. W. Johnson Limestone Co. appealed.

*Error assigned* was, inter alia, decree, quoting bill of exceptions.

*W. W. Braham,* of *Aiken & Braham,* for appellant.—
The contingency of the son's remarrying and a second
wife's being alive at the time of the son's death is re-
ferable to the death of the son and not to the death of
the testator: Field's Est., 266 Pa. 474; Jessup v. Smuck,
16 Pa. 327; Mickley's App., 92 Pa. 514; Jackson's Est.,
179 Pa. 77; Engles Est., 180 Pa. 218; Johnson v. Mor-
ton, 10 Pa. 245; Kirkpatrick's Est., 280 Pa. 306; Me-
bus's Est., 273 Pa. 505; Detter's Est., 280 Pa. 135;
Woelpper's App., 126 Pa. 562; Mulliken v. Earnshaw,
209 Pa. 226.

No extrinsic evidence is needed to construe the will
and the fact that Orie is still living with his first wife
does not affect any of the provisions of the will: Van
Leer v. Van Leer, 221 Pa. 195.

Even the construction adopted by the court below,
referring the contingency of the son's remarrying to
the death of the testator, would not operate to destroy
all subsequent estates created by the will: Fletcher v.
Hoblitzel, 209 Pa. 337; Portuondo's Est., 185 Pa. 472;
Woodburn's Est., 151 Pa. 586; Hamlin v. Thomas, 126
Pa. 20.

The terms of Terhan H. Kariher's will were intended
to convey and are ample to convey all of the testator's
estate: Eichelberger's Est., 274 Pa. 576; Lippincott's
Est., 276 Pa. 283; Buch's Est., 278 Pa. 185; Reisher's
Est., 261 Pa. 223; Jacob's Est., 81 Pa. Superior Ct. 427;
Schaper v. Coal Co., 266 Pa. 154; Eckert v. Trust Co.,
212 Pa. 372; Ferry's App., 102 Pa. 207; Miller's App.,
113 Pa. 459; Dull's Est., 137 Pa. 112.

Testator did not die intestate as to any part of his
estate. He gave a life interest in his residuary estate
to his son Orie; one-half of the residue in fee to the
children of Orie, subject to the life estate; a life estate
in the other half to a possible second wife of Orie; a re-
mainder in fee to the second half to the children of Orie,
subject to the two life estates; and an executory devise
to the children of Dora Scott. The remainders to the

children of Orie Kariher are vested remainders: Walker's Est., 277 Pa. 444; Groninger's Est., 268 Pa 184; Pearson's Est., 280 Pa. 224; Jackson's Est., 179 Pa. 77; Eichelberger's Est., 274 Pa. 576.

The provisions in favor of the children of Dora Scott creates an executory devise or alternative limitation: Stoner v. Wunderlich, 198 Pa. 158; Moss Est., 80 Pa. Superior Ct. 323; Stump v. Findlay, 2 Rawle 168; Buzby's App., 61 Pa. 111.

After the appointment of trustees to represent contingent interests, all persons in interest are represented in the proceeding: Snyder's Est., 274 Pa. 574; Moorehead v. Wolff, 123 Pa. 365.

The orphans' court has jurisdiction: Cardon's Est., 278 Pa. 153; Souder's App., 57 Pa. 498; Winton's App., 97 Pa. 385; Schollenberger's App., 21 Pa. 337; McGowen v. Remington, 12 Pa. 63; Carney v. Trust Co., 252 Pa. 381.

*C. H. Akens,* for appellee.—A construction which disinherits an heir is to be avoided where possible: Edelman's Est., 276 Pa. 503-508; List's Est., 283 Pa. 255.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, November 23, 1925:

UNDER THE UNIFORM DECLARATORY JUDGMENTS ACT.

This is a proceeding in the Common Pleas of Lawrence County under the Uniform Declaratory Judgments Act of June 18, 1923, P. L. 840. Three persons, claiming to be absolute owners of mineral property in a certain farm, negotiated a lease, or sale in place, of the limestone underlying the surface. After terms were agreed on, the proposed lessee questioned the title of one of the lessors, claiming the latter had but a life estate; whereupon, the lessor petitioned the court below for a declaration as to his property rights. All persons having a possible interest were joined as respondents, in-

cluding certain alleged remaindermen and a trustee (Snyder's Est., 274 Pa. 574) appointed to represent other possible contingent remaindermen and persons who might in the future possess an alternative interest. The answers of three of the defendants, including the present appellant, denied the petitioner's absolute estate. The court below concluded that the petitioner possessed a fee absolute in an undivided one-third of the minerals in question, with the right to execute the proposed lease; whereupon the G. W. Johnson Limestone Company, the proposed lessee, filed this appeal.

In addition to attacking the legal correctness of the conclusion just stated, appellant raises the question of the constitutionality of the Declaratory Judgments Act; and, if this latter point is decided against it, then appellant questions the right of the court below to assume jurisdiction under the act, claiming that the orphans' court, and not the court of common pleas, was the proper tribunal for that purpose.

After briefly stating the salient facts of the case, we shall dispose of the above questions in their inverse order.

Abigail Kariher owned a farm of fifty acres in Lawrence County, underlaid with limestone. On August 23, 1902, she leased the limestone to appellant company for a term of twenty years from January 1, 1903. No limestone was quarried or removed during the term, but the minimum royalty stipulated for in the lease was paid annually. The lease contained an "option to [the lessee] to take and receive a new lease of said premises." Abigail Kariher died, a widow, in 1904, intestate, and leaving, as her only descendants and sole heirs at law, three sons, John C. F. Kariher, Hiram Kariher and Terhan H. Kariher. In 1909, Hiram and Terhan conveyed their respective undivided interests in the farm to their brother John, but each reserved his interest in the limestone, oil and gas underlying the premises. In 1912, the three sons leased twenty-five acres of the farm

for oil and gas purposes. Hiram died in 1922, testate, and his undivided one-third interest in the limestone passed to Bernard F. Kariher, his only child. John still lives and retains his one-third interest in the limestone. Terhan died August 20, 1920, leaving to survive him an only child, Orie M. Kariher, the appellee. The lease now in controversy was negotiated by Orie M. Kariher, claiming to be the owner in fee of an undivided one-third of the mineral rights in question, and by his uncle John C. Kariher, claiming another third, and his cousin Bernard F. Kariher, claiming the remaining third. No question is raised as to the absolute ownership of the two last mentioned persons, but that of Orie M. Kariher is questioned, as before stated.

The controlling point submitted for decision by the court below was, whether the proposed lease by the three persons above named "would pass and convey to such lessee full legal right and authority to mine and remove said limestone and to exercise all other rights and privileges on said premises granted to said lessee by the terms of such lease"; and, to pass upon this question, it, of course, became necessary for the court below to determine the subordinate question, also submitted, as to the quality and quantity of the interest of Orie M. Kariher, one of the three lessors.

### JURISDICTION OF THE COURT BELOW.

In considering whether the court of common pleas, rather than the orphans' court, had jurisdiction to determine the above questions, it must be kept in mind that the proposed lease, while negotiated pursuant to the option contained in the original lease, was not to be executed by representatives of the estate of the original lessor, Abigail Kariher, deceased, but by three persons claiming to be present owners of the property.

The Uniform Declaratory Judgments Act provides by section 1 that "courts of record, within their respective jurisdictions, shall have power to declare

rights," etc., and by section 2 that "Any person inter-
ested under a......written contract or other writings
constituting a contract or whose rights, status or
other legal relations are affected by a......contract,
......may have determined [by the court] any ques-
tion of construction or validity arising under the instru-
ment......and obtain a declaration of rights, status, or
other legal relations thereunder."

Since there was no effort in this proceeding to enforce
against the estate of the deceased lessor specific per-
formance of the option clause in the original lease,—
the proceedings being instituted as before stated, for
the purpose of ascertaining and declaring the legal right
of one of the parties to the new lease, to contract, so that
appellant company, as well as the other parties to the
contract agreed on, would know whether it was bound to,
or could with legal safety, accept the lease in question
and obtain thereunder the rights bargained for,—we are
of opinion that the court of common pleas was the
proper tribunal to adjudicate the points involved, rather
than the orphans' court.

### CONSTITUTIONALITY OF THE ACT.

Before considering the constitutionality of the Uni-
form Declaratory Judgments Act, we stop to note that
the history of this form of procedure, and an excellent
account of its scope, competence and effectiveness, may
be found in an article by Prof. Borchard, in 28 Yale
Law Journal, 1-32, 105-150; see also article by Prof.
Sunderland, in 16 Michigan Law Review 69-89. Suffice
it for present purposes to say that the procedure of
declaratory judgments originated in the classical Ro-
man law and later was adopted by and is still exten-
sively used in many European and Spanish-American
countries. Scotland has fully enjoyed this practice for
four centuries; from there it was introduced into Eng-
land, where it has been used in some form for seventy-
five years, and in a very broad form for the past forty

years.  The English Supreme Court of Judicature, having been given the rule-making power by the Judicature Acts, adopted rules in 1883 (Order XXV, rule 5) and 1893 (Order LIV, A) to provide for this very extensive practice, which now prevails in substantially every part of the British Empire.

The distinctive characteristic of the declaratory judgment is that the declaration stands by itself; that is to say, no executory process follows as of course.  Again, in order to obtain a declaration, it is not required that an actual wrong should have been done, such as would give rise to an action for damages, and no wrong need be immediately threatened, such as would be the proper basis for an injunction.  In other words, a cause of action, in the sense in which that term is ordinarily used, is not essential to the assumption of jurisdiction in this form of procedure.  It is upon these characteristics of the declaratory judgment that the chief constitutional attacks have been based; its opponents contending the declaration of legal rights and obligations contemplated by the act represents the exercise of a nonjudicial duty, which the legislature cannot place on the courts, and that, since such declarations do not necessarily include the right to execution, they are not judgments at all, but represent the mere giving of advice, rather than the adjudication of controversies; further, that an occasion for judicial action cannot properly arise until some claim is made that an actual wrong has been done or is imminent; and, finally, that the whole idea of the declaratory judgment is an unallowable innovation.

In considering these contentions, it may first be noted that there are many judgments under present forms which do not include the right to execution, except possibly for costs; and the present declaratory judgment practice involves an award as to costs (see section 10 of the act) ; moreover, under the act before us (section 8), execution, or "further relief," based on a declaratory judgment, may be had where appropriate, and allowed

by the court. Next, it may be noted that, since the numerous jurisdictions enjoying this practice all hold that a real controversy must exist, that moot cases will not be considered, and that declaratory judgments are res judicata of the points involved, such judgments cannot properly be held merely advisory; and that there can be proper occasion for judicial action before the infliction of injury or its immediate threat, is sufficiently shown, for example, by the quia timet actions, which lay before damage and without imminent danger thereof, Finally, it should be observed that an act like the present one which permits only a more general use of a device heretofore existing in our practice, cannot be held to be an unallowable innovation in Pennsylvania; for we in this State have long resorted to the declaratory judgment in many fields, though not calling it by that name.

Judgments in suits against the State do nothing more than declare the legal result of the relations between the parties; they include no right to execution. In equity proceedings to remove a cloud from the title to real estate, where no consequential relief is granted (which includes most of such cases), the court does nothing more than declare the law. In cases of bigamous marriages, the Act of April 14, 1859, P. L. 647, provides that the courts of common pleas can declare that the second marriage was void from the beginning; no new status is created and no execution follows, the decree being purely declaratory: see Klaas v. Klaas, 14 Pa. Superior Ct. 550. 553; McClain v. McClain, 40 Pa. Superior Ct. 248, 251; Newlin's Est., 231 Pa. 312, 314; Hornbake v. Hornbake, 72 Pa. Superior Ct. 605. Under our well established practice of ruling one out of possession of real estate to bring an action of ejectment, the petitioner asserts title to property and recites that the person named as defendant likewise claims title; if the final decision favors the petitioner, the court simply makes a declaration as to the legal relations of the par-

ties, without any execution following and without the right to execution.[1]

Though usually camouflaged as an adverse executory action, perhaps the best known example, in Pennsyl-. vania practice, of a proceeding to obtain a declaratory judgment is the case stated to pass on the marketability of the title to real estate, wherein we are so frequently called upon to construe wills and other written instruments; in most of such cases, no execution is con-. templated by anyone concerned, and the executory judgment is a mere form, which the necessities of our practice, before the present act, induced the courts to tolerate.[2]

No doubt many other instances could be cited where we in Pennsylvania are to-day, and have been for many years, indulging in declaratory judgments; the present legislation simply makes that practice more extensive. When this latter fact is realized, the whole argument as to the act's imposing on the courts something new, in the nature of a nonjudicial function, fails; for the statute before us merely presents the extension of a long and well established judicial function, previously enjoyed to a considerable extent in this State, of declaring the law which governs a given condition of facts so as to make the controversy covered by these facts res judi-

---

[1] For some of the statutes providing for this kind of procedure, and cases under them, see the following: Act of April 3, 1872, P. L. 33; Act of June 11, 1879, P. L. 127, as amended by the Act of June 24, 1885, P. L. 152; Act of May 21, 1881, P. L. 24: Delaware & Hudson Canal Co. v. Genet, 169 Pa. 343, 347; Act of March 8, 1889, P. L. 10, as amended by the Act of May 25, 1893, P. L. 131, and the Act of April 16, 1903, P. L. 212: Cambria Iron Co. v. Leidy, 226 Pa. 122, 129; Foster's Petition, 243 Pa. 92, 95; Clark v. Clark, 255 Pa. 574, 579; Act of June 10, 1893, P. L. 415: Ullom v. Hughes, 204 Pa. 305, 309; Titus v. Bindley, 210 Pa. 121; Fearl v. Johnstown, 216 Pa. 205; Act of April 18, 1905, P. L. 202.

[2] Compare Drace v. Klinedinst, 275 Pa. 266, an instance of a case stated, with Devlin's Trust Est., 284 Pa. 11, a very similar case proceeded with under the act now before us.

cata, albeit in many cases no execution may be called for, and even though the action was started before damages were actually inflicted or before danger thereof was imminent.

The declaratory-judgment procedure has been available not only in the foreign jurisdictions hereinbefore mentioned, but in Rhode Island since 1876, in Connecticut since 1893, and in New Jersey since 1915; in all of these states the scope of the practice has been widened by statutes passed at later dates. Other American states have enacted declaratory-judgment laws in more recent years,[3] and wherever the constitutionality of these statutes has been raised they have been upheld, with a single exception.

The only jurisdiction in which a declaratory-judgment statute has been held unconstitutional is Michigan. There, the question arose in a case which was not a proper one for such a judgment, and the statute was held to be unconstitutional, by a divided court (see Anway v. Grand Rapids Ry. Co., 211 Mich. 592, 179 N. W. 350, 12 A. L. R. 26); but this decision has not been followed in any other state, as far as we are aware.

The Michigan court seems to have been of the impression that proceedings under the act dealt simply with moot cases or called for only advisory opinions, not for

---

[3] Rhode Island: Acts 1876, c. 563, s. 17, now, with supplements, in 1923 Gen. L. par. 4952-3; Connecticut: Acts 1893, p. 237, now with amendments, in 2 Gen. St. (1918) s. 5113; Acts 1921, c. 258; New Jersey: 1915 P. L. 185; 1924 P. L. 312 (Uniform Act); Michigan: Acts 1919, p. 278; Florida: 1919 Laws, p. 148; Wisconsin: 1919 Laws, p. 253, repealed by 1923 Laws, p. 848; Kansas: Acts 1921, c. 168, now in 1923 Rev. St. p. 900; New York: Civ. Prac. Act 1921, s. 473; California: Acts 1921, p. 689, 1923 Code Civ. Pro., s. 1060; Kentucky: 1922 Laws, p. 235; Virginia: 1922 Laws, p. 902; South Carolina: Acts 1922, p. 967; Colorado: 1923 Laws, p. 268 (Uniform Act); North Dakota: 1923 Laws, c. 237 (Uniform Act); Wyoming: 1923 Laws, c. 50 (Uniform Act); Tennessee: 1923 Laws, p. 101 (Uniform Act); Utah 1925 Laws, p. 40 (Uniform Act); South Dakota: 1925 Laws, p. 230.

judicial decisions; but the difference between declaratory judgments and both advisory opinions and decisions of moot cases is obvious and need not be dwelt upon in detail. A moot case is imaginary, it does not exist in fact; to decide it serves no useful purpose,—nothing is adjudicated, for nothing is affected (Com. v. Mamatey, 257 Pa. 327; Lord v. Veazie, 8 How. 251; Adams v. Union R. Co., 21 R. I. 134, 140, 42 Atl. 515), whereas a declaratory judgment must always deal with a real dispute over real facts. An advisory opinion is merely a giving of advice; it is not binding (Sackville's Case, 2 Eden 371, 28 Eng. Reprint 940; Green v. Com., 12 Allen 155, 163; Opinion of the Justices, 25 N. H. 537; Taylor v. Place, 4 R. I. 324, 362), while a declaratory judgment is a final judgment (section 1 of the act) and constitutes res judicata: Badar Bee v. Habib Merican Nordin (1909), A. C. 615; Curtis v. Sheffield, 21 Ch. Div. 1.

In the Michigan case, the court also thought (mistakenly, we join other courts in believing) that Gordon v. United States, 2 Wall. 561, 117 U. S. 697, and Muskrat v. United States, 219 U. S. 346, required it to hold the act under consideration unconstitutional. The Gordon Case was an appeal from the court of claims. The statute creating that court provided for such appeals, but it also provided that amounts adjudged due by it were subject to approval by the secretary of the treasury; consequently, the adjudication was not final. Under these circumstances, Chief Justice TANEY, refusing to entertain the appeal, said (p. 702), inter alia, "The award of execution is a part and an essential part of every judgment passed by a court exercising judicial power; [there] is no judgment, in the legal sense of the term, without it." This language (used, of course, in an entirely different connection) was thought by the Michigan court to show that a declaratory judgment was not one of a character which a judicial tribunal could be called on to review; but, subsequently, that part of the federal statute which provided for action by the secretary

of the treasury was repealed, and the Supreme Court now exercises appellate jurisdiction in such cases, even though there is no means of executing a judgment against the United States. It is obvious, therefore, that the Supreme Court itself in effect held the above-quoted language (which, by the way, was never formally filed as the opinion of the court) too broad to be accepted as a statement of a universal rule that every judgment, to be accounted such, must be susceptible of having execution thereon. The real reason for the Gordon decision was not that the judgment of the court would be incapable of execution, but that, if rendered, it would not be final, the provision for the action of the secretary being "inconsistent with the finality essential to judicial decisions": see United States v. Klein, 13 Wall. 128, 144.

The Muskrat Case arose out of an act of Congress which authorized the plaintiff to bring an action in the court of claims to test the validity of a federal statute relating to Indians, the United States being named as defendant; provision was made for an appeal to the federal Supreme Court. The government had no interest adverse to the plaintiff, and the Indians affected were not parties; hence there was no real controversy to be adjudicated, and the Supreme Court refused to consider the appeal, Justice DAY saying (p. 362), "In a legal sense, the judgment could not be executed." The Michigan court thought that this "should forever put at rest" the question of the constitutionality of the Declaratory Judgments Act. But Justice DAY said also (p. 361), that "judicial power......is the right to determine actual controversies arising between adverse litigants duly instituted in courts of proper jurisdiction," and (p. 362) that a judgment entered on the then-present record would not be conclusive "when actual litigation" might bring to the court the question there involved; his opinion as a whole clearly shows that it was the lack of an actual controversy between adverse litigants pres-

ent in court which kept the case from being a proper one for judicial decision.

When adverse litigants are present in court and there is a real controversy between them, a final decision rendered in any form of proceeding of which the court has jurisdiction is a judgment in the proper sense of that term, and the giving of it is a judicial function, whether or not execution may follow thereon. For instance, the ordinary judgment for defendant is merely a declaration that, on the evidence offered, the plaintiff has no case; though as a matter of fact, it may be entered in an action or proceeding which was instituted by the plaintiff with the idea, or hope, of securing an executory judgment; but, like all other declaratory judgments, a judgment for defendant has the effect of making the issues at stake res judicata, and, in this important sense, such judgments are forever enforceable,—which, more than the fact that execution may or may not be issued thereon, gives them the character of judgments. These conclusions, while contrary to those of the Michigan court, accord with the prevailing opinions expressed by the appellate tribunals of other states.[4]

As to any question of invalidity by denial of trial by jury, it is sufficient to say that the act, by section 9, expressly provides for that sort of procedure in cases which involve the determination of an issue of fact, where a trial by jury would be the proper method of determining such issue: North Penn C. Co. v. Snowden, 42 Pa. 488; Tillmes v. Marsh, 67 Pa. 507. Under Connecticut's first act, the state supreme court ruled that there should be a jury trial in such cases, and so upheld the constitutionality of the statute, although it

---

[4] See State v. Grove, 109 Kan. 619, 201 Pac. 82, 19 A. L. R. 1116; Board of Education v. Van Zandt, 119 N. Y. Misc. 124, 195 N. Y. Supp. 297, affd., 204 N. Y. App. Div. 856, 197 N. Y. Supp. 899, affd., 234 N. Y. 644, 138 N. E. 481; Blakeslee v. Wilson, 190 Cal. 479, 213 Pac. 495; Braman v. Babcock, 98 Conn. 549, 120 Atl. 150; Miller v. Miller, 149 Tenn. 463, 261 S. W. 965.

contained no provision for the calling of a jury, as does the Uniform Act now before us: see Miles v. Strong, 68 Conn. 273, 36 Atl. 55; Layton v. Bailey, 77 Conn. 22, 58 Atl. 355; Dawson v. Town of Orange, 78 Conn. 96, 61 Atl. 101.

There is no denial of due process of law. The instant act takes the fundamental conceptions of declaratory-judgment procedure as theretofore established. The court must have jurisdiction; there must be notice, an opportunity to present one's cause, a proceeding appropriate to the character of the particular case, and an adjudication of the same nature as is present in other cases. Where these things are present there is due process of law: Hagar v. Reclamation District, 111 U. S. 701, 708. The Fourteenth Amendment to the Federal Constitution does not undertake to control the power of the State to determine by what process legal rights may be asserted or legal obligations enforced, or what form procedure and practice shall take, so long as the above elements are present: Iowa Central Ry. Co. v. Iowa, 160 U. S. 389, 393; Louisville & Nashville R. R. Co. v. Schmidt, 177 U. S. 230, 236. In determining whether the essential elements exist, the substance of matters, and not their mere form, is the governing thing: Simon v. Craft, 182 U. S. 427, 436, 437.

The legislature has power to change methods of procedure, to create new forms and to remove restrictions against invoking court action; for example, a statute providing for the quieting of title under circumstances which theretofore would have been insufficient for laying the foundation of such a suit, is constitutional: Holland v. Challen, 110 U. S. 15. In passing on the validity of such legislation, courts do not fail to recognize that the law is a progressive science, that forms of procedure which at one time were regarded as essential may no longer be necessary, and that changes may validly be made: Holden v. Hardy, 169 U. S. 366, 385; Hurtado v. California, 110 U. S. 516, 529; Twining v. New Jer-

sey, 211 U. S. 78, 101. The history of procedure and forms of action is a story of many changes, and the written Constitutions of Pennsylvania and the United States do not act as barriers to further changes of this nature so long as the fundamental elements of due process are retained. The declaratory-judgment procedure offers another method by which a party can call on the courts to adjudicate his rights, but it is the same as existing methods in that it follows due process of law. The Michigan court did not pass on the question of due process of law; but, again we may say, the conclusions reached by us are in accord with those prevailing in the states where this question has been raised: Miles v. Strong, 68 Conn. 273, 36 Atl. 55; Miller v. Miller, 149 Tenn. 463, 261 S. W. 965.

Before closing our consideration of the branch of the case now under discussion, it may be well to state that, in all jurisdictions where declaratory-judgment practice obtains, the rule is established that it is a matter of judicial discretion whether or not jurisdiction will be taken of any particular case (Dyson v. Attorney-General (1911), 1 K. B. 410, 417; Braman v. Babcock, 98 Conn. 549, 120 Atl. 150; section 6 of the act); that a proceeding to obtain such a judgment will not be entertained where the court lacks jurisdiction of the subject-matter involved (British So. Africa Co. v. Companhia de Mocambique (1892), 2 Q. B. 358), or where another statutory remedy has been specially provided for the character of case in hand (Barraclough v. Brown (1897), A. C. 615; Bull v. Attorney-General (1916), 2 A. C. 564); and that jurisdiction will never be assumed unless the tribunal appealed to is satisfied that an actual controversy, or the ripening seeds of one, exists between parties, all of whom are sui juris and before the court, and that the declaration sought will be a practical help in ending the controversy: Lewis v. Green (1905), 2 Ch. 340; State v. Board of Commrs., 117 Kan. 151, 230 Pac. 531; Axton v. Goodman, 265 S. W. (Ky.) 806; Ezzell

v. Exall, 269 S. W. (Ky.) 752. Moreover, in a declaratory judgment proceeding the court will not decide future rights in anticipation of an event which may not happen, but, just as in the ordinary executory action, it will wait until the event actually takes place, unless special circumstances appear which warrant an immediate decision, as, for instance, where present rights depend on the declaration sought by plaintiff; and even then such rights will not be determined unless all parties concerned in their adjudication are present and ready to proceed with the case (see section 11, of the act) so that the judgment rendered will make the issues involved res judicata in the full sense of that term: In re Staples (1916), 1 Ch. 322; Norton v. Moren, 267 S. W. (Ky.) 171; Ackerman v. Union and New Haven Trust Co., 91 Conn. 500, 100 Atl. 22.

In our opinion, the Uniform Declaratory Judgments Act is a constitutional piece of legislation, which, within proper limits, can be made of real use.

### MERITS OF THE CASE.

On the merits of the case, we cannot agree with the construction placed on the will of Terhan H. Kariher by the learned court below; nor can we agree that, on the theory of an intestacy as to the corpus of the property here involved, Orie M. Kariher possessed an absolute estate in fee therein, so that, as owner of a one-third undivided interest in such limestone, he could legally grant the lease bargained for with appellant.

Testator, after directing payment of his debts and making some minor bequests, provided by item 4 of his will as follows: "I......devise......to my son, Orie Kariher, absolutely as his own," a certain piece of real estate in the City of Youngstown, Ohio. Then, by item 5, the part of the will in which we are principally concerned, he provided thus: "I will, devise and bequeath to my son, Orie Kariher, the use and income of all the rest and residue of my property whether real, personal

or mixed, during and for his life. If my said son, Orie Kariher, should remarry, and his second wife is living at the death of my said son......then she is to receive one-half of the income and profits, as long as she remains his widow, providing she has always remained with my said son, Orie Kariher. If she is divorced or remains away from him more than one week, she is not to receive any part of my estate. At her death her one-half is to go to the children of my said son Orie Kariher. The other one-half of my property to go to the children of my said son, Orie Kariher. If there are no children living at the time of my said son, Orie Kariher's death, and his second wife's death, then all of my said property remaining shall go to the children of Dora Scott, the girl I raised." In item 6, the testator emphatically provides that, "Mary McIntosh Kariher, the wife of my said son, Orie Kariher, must not have any part of my estate."

Mary McIntosh Kariher, excluded by testator from all participation in his estate, was at the time of the making of the will, and still is, the legal wife of Orie M. Kariher. When this fact is borne in mind, and, in connection therewith, the last above-mentioned testamentary direction, it becomes apparent that Orie's father had no intention, by the fifth item of his will, of vesting a fee in his son; and item 4 plainly shows that testator knew how to bestow a fee when he desired to do so. But, aside from these considerations, the language employed in item 5 is sufficiently clear in itself to indicate the intention of testator. There, in plain words, he first gives a life estate to his son, and, at the son's death, he gives a life estate, or an estate during widowhood, in an undivided part of the property involved to a possible second wife of the son, if the son should remarry and leave a second wife living at the time of his death, provided this possible second wife meets with certain conditions. Of course, this latter life estate is contingent, there being no ascertained per-

son in whom it might vest. After the death of the possible second wife, or at the death of Orie M. Kariher, should he leave no second wife, the children of Orie take all of testator's property; and, "if there are no children living at the time of......Orie Kariher's death, and his second wife's death, then all of [testator's] property [goes] to the children of Dora Scott." This latter provision is an alternative limitation to take effect at the time stated, if there is then a failure of issue of Orie Kariher. Since Orie has a son in being, this son possesses a vested remainder, subject to open and let in other afterborn brothers and sisters, and also subject to be defeated by his death without issue prior to the decease of his father, and to postponement in part as to its enjoyment by his parent leaving surviving him a second wife.

In reaching the above conclusions, we have not lost sight of the facts that, at the date of the will, Orie and his wife were separated, that this unhappy state of affairs continued till the decease of testator, some two and a half years thereafter, and that now they are reunited; nor have we overlooked any other of the facts, outside of the will, relied on by the court below or called to our attention by counsel for appellee, showing the conditions which surrounded testator at the time of the execution of his will; but none of these facts can alter or explain away either the plain meaning or legal effect of the words employed in the testamentary dispositions before us, which show that Orie M. Kariher possesses only a life estate in the property here in controversy, and, therefore, cannot contract with appellant according to the terms agreed on for the proposed new lease, so as to vest in the latter the absolute right to the limestone which it bargained to acquire.

The court below, in its formal judgment, very properly declared merely what it conceived to be the legal rights of the several parties in the premises; but it erred in reaching and acting on the conclusions that

"the full title" to an undivided one-third of the limestone in question is "now" vested in Orie M. Kariher, and that "no other person has any right, title or interest therein," and also, in reaching and acting on the further conclusion that, for the reason just given, Orie M. Kariher, by joining with John C. F. Kariher and Bernard Kariher in the execution of the lease agreed upon between them and appellant, can pass a good title "in fee simple" to the latter. It should have declared, on the contrary, that Orie M. Kariher had only a life estate in the one-third undivided interest in the limestone covered by the proposed lease, leaving the parties in interest to enter suitable proceedings, in the proper tribunal, to accomplish the legal consummation of the new lease.

The assignments of error are sustained, and the judgment is reversed with directions that the court below enter judgment in conformity with the views here expressed. The costs of this appeal are divided between Orie M. Kariher and the G. W. Johnson Limestone Company.

---

# Kariher's Petition (No. 2).

Argued October 9, 1925. Appeal, No. 147, March T., 1925, by G. W. Johnson Limestone Co., from decree of O. C. Lawrence Co., Sept. T., 1924, No. 1, in proceeding under the Uniform Declaratory Judgments Act in Estate of Terhan H. Kariher, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

Petition for decree under Uniform Declaratory-Judgments Act. Before EMERY, P. J.

Rule, granted on the petition, discharged. G. W. Johnson Limestone Co. appealed.