EUGENE R. MCPHEE, Executive Director, Board of Regents of StateUniversities
You have requested my opinion as to whether there is a possible conflict of interest or violation of law in the situation where an appointee to the Board of Regents has a substantial interest in a printing company that is currently under a state printing contract to print the faculty and state newspapers at one of the state universities. The contract in question terminates September, 1972, having been awarded September, 1970.
The request for an opinion was initiated by the appointee so as to avoid any possible question of impropriety.
Article IV, sec. 25, Wis. Const. reads:
"Stationery and printing. SECTION 25. The legislature shall provide by law that all stationery required for the use of the state, and all printing authorized and required by them to be done for their use, or for the state, shall be let *Page 173 
by contract to the lowest bidder, but the legislative may establish a maximum price; no member of the legislature or other state officer shall be interested, either directly or indirectly, in any such contract."
Clearly, a member of the Board of Regents of State Universities is a state officer. Martin v. Smith (1941), 239 Wis. 314.
The party in question is the executive secretary of the company and holds 50 percent of the corporation's stock. The appointee, under such circumstances, must be deemed to have a direct interest in the printing, contract.[1]
Administrative agencies, such as the Board of Regents of state Universities or the Department of Administration, are in fact the state, and when such state agencies execute contracts it is under law a state contract. Sullivan v. Board of Regents of Normal Schools (1932),209 Wis. 242.
Consequently, for the purpose of answering this request, it is immaterial whether the Regents execute the printing contract or the Department of Administration for, in either case, it is a state printing contract. Nor is it relevant that the contract is awarded to the lowest bidder, for this criteria is recognized, even required by the constitutional provision.
Applying the facts to the constitutional provision, it must be concluded that the appointee would be a state officer having a direct interest in a state printing contract. The fact that the contract was entered into prior to the slightest hint of the appointment does not, in my opinion, affect the question as to the validity of the appointment. This conclusion is reached for it is somewhat apparent from the wording of the constitutional provision itself that something more than safeguarding the awarding of the contract was intended. This is true for the constitutional provision requires that the contract be let to the lowest bidder. A state officer, due to his position, could have an unfair advantage over other bidders. This situation would, however, in most cases, only work to the disadvantage of the other bidders, for the state *Page 174 
officer would still have to be the low bidder and the interest of the state would not necessarily suffer. Subsequent to the award of the contract, however, the state officer could be in a highly advantageous position and possibly to the direct disadvantage of the state. The conflict of interest that might arise after execution of the contract is, of course, in the performance of the contract. A hypothetical situation would be to have the state university employes take the position that the contract was not being properly performed but nevertheless conceal such belief for fear of offending the state officer under whom they are employed. A similar situation was noted in State exrel. Hopkins v. Grove (1921), 109 Kan. 619, 201 Pac. 82, 19 A.L.R. 1116, 1123. In this case the court stated:
"The defendant's disqualification results from the plain and unambiguous language of the statute. It is also as clearly within the purpose and spirit of the act. The legislature obviously proceeded upon the assumption that a corporation holding a franchise from or contract with the city was likely, by reason thereof, to be drawn into controversy with it, and that a city officer who was required to take some action in relation to the matter, if he were an employee of the company in any capacity, might be influenced in his conduct by that circumstance. The provisions of the ordinances described are of such character that a dispute might readily arise out of conflicting interests, and the connection of a member of the commission with the company might prove an embarrassment. * * *."
There may possibly be some merit to the suggestion that Art. IV, sec.25, Wis. Const., would not bar a state officer from having an interest in a printing contract that is completely divorced from his particular office. However, in the present situation, we have a printing contract, although executed by a different state agency, nevertheless provides for the furnishing of printed materials to the state officer's own agency. The employes of the state officer's agency have the responsibility to see that the contract is satisfactorily performed. Obviously, under this situation a conflict of interest could arise. *Page 175 
There is little, if any, direct authority to rely on in this matter and no Wisconsin case authority has been found to aid in the interpretation of the constitutional provision. In turning to the materials on the Wisconsin Constitutional Convention surrounding the adoption of this provision, a rather interesting and involved history is found. However, what weight should be given to this history in interpreting the provision in question is problematical.
The Journal of the Convention of 1846 shows that the delegates were highly concerned with the printing of the Journal and other materials for the Convention. The Journal shows that Beriah Brown was elected to be the printer (p. 23). As printing was apparently one of the major expenses of the Convention (p. 470), the Convention spent a great deal of time debating the matter and it became a major political issue.[2] The struggle is fairly well summed up in a selection from The Madison Express:[3]
"It will be seen by the reports of the proceedings of the convention that Mr. Gray of Grant County offered a resolution to have the printing let out to the lowest bidder, measure which would have saved a large sum to the people of the territory. Had the vote been taken immediately upon it, there is no doubt that a large majority would have been found in its favor. But the consideration of the resolution was postponed, and the interim afforded an opportunity for certain leaders to `whip in' refractory members and thus defeat the wishes of the people. When the resolution was called up it was immediately quashed, and the election of a printer gone through with, which resulted in the choice of Mr. Brown of the Wisconsin Democrat. Although the election of a printer was their object, yet the Old Hunkers are by no means content with the result, and an ineffectual attempt was made to reconsider the vote. We said that a large sum would have been saved to the people of the territory had the printing been let out to the lowest bidder. Economy in expenditures, however, is no part of the Locofoco creed, *Page 176 
and if the people do not by their votes emphatically say so when the state has been organized, we shall be much mistaken."
Apparently, to avoid this same problem, the delegates to the 1847-1848 Convention quickly quashed a motion by delegate Wheeler to employ a particular printing company and adopted a resolution that the contract be let to the lowest bidder. (p. 7) (All references are to pages in the Journal of the Constitutional Convention of 1847-1848.)
The Convention received several bids, two of which are of considerable interest. The Argus firm agreed to do the printing for one cent. Another firm offered to do the printing for "one-half of the sum it has already cost the people of the territory in the discussion had on that subject." The offer of the Argus firm was accepted (pp. 31-34). The following day the Convention received a scathing petition, the first paragraph of which stated:
"The undersigned, employed printers of the village of Madison, being informed of the action of your Hon. body in letting out to the lowest bidder the printing which may be within your control, and noticing a proposition now pending, to place in the constitution a clause which shall make a similar disposition of all future printing, and properly appreciating the enlightened `progression,' which has dictated such action, and desirous that the `true democratical principle' thus applied to them should be extended to others, respectfully petition that an additional clause be inserted in the constitution now in progress of formation by your Hon. body letting out to the lowest bidder all the offices under the new state government, of whatever nature or kind, and all services of whatever description or character."
And the last paragraph of the petition concluded:
"Personally, your memorialists wish the adoption of their petition from an apprehension that the action already had and contemplated, is to lessen their means of daily living, which are already scant enough; and actuated by the hope that other sources of present employment will be opened to them, they further ask that if in the power of your Hon. *Page 177 
body the offices now attached to it be declared vacant, and then let out to the lowest bidder, for which we pledge ourselves to make offers at far less rates than are likely otherwise to be paid." (pp. 39-40)
Needless to say, the Convention did not appreciate the sentiments contained in the petition and the delegates' views are clearly reflected in the Journal. (pp. 40-41) Mr. Judd of the Convention moved to have the petition rejected, which it was even though one of the delegates noted that everyone has a right to petition his government. (p. 41)
The same Mr. Judd was on the committee that prepared the Article on the Legislature, which article did not, as initially reported, contain the constitutional provision now under consideration. (pp. 117-118) Nor did the rejected constitution have such a provision, a resolution providing for a similar prohibition having been defeated. (Journal of the Convention 1846, pp. 406, 419)
While the relevancy of all this may seem somewhat remote, it does, nevertheless, show the concern, almost preoccupation, of the delegates over the issue of State printing. In this regard, I think it is fair to assume from all this that the delegates to the second Convention had profited from the experiences of the first Convention. Further, the petition of the disgruntled printers must have influenced the delegates in the adoption of the constitutional provision under consideration. It is clear that it was the intent of the delegates that the printing contract for the Convention be divorced from political or personal consideration and this intent was carried over to the constitution.
This background influenced the delegates in the adoption of Art. IV, sec. 25, Wis. Const. For it certainly is significant to have a constitutional provision pertaining to printing contracts. In my opinion, the experience of the delegates and their intent was clearly expressed in sec. 25 as requiring that printing contracts be subject to competitive bidding and that no officer of this state have an interest in such contracts.
In the present situation, I can only conclude from the plain language of the constitutional provision and for the *Page 178 
reasons previously discussed, the appointee would be in a situation of possible conflict of interest and would be in violation of Art. IV, sec.25, Wis. Const.
RWW:CAB
[1] Sec. 946.13, Stats., Private Interest in Public Contract, defines interest at anything over 2 percent of the corporate stock.
[2] The Struggle Over Ratification 1846-1847, Milo M. Quaife, pp. 17 64, 68-69, 92, 104.
[3] Id. p. 160.