Karns et al. v. East Central Fruit Growers Production Credit Assn.

*J. McD. Sharpe*, of *Sharpe & Sharpe*, and *Peyton G. Jefferson*, for petitioners. *John L. Bitner*, for respondent.

DAVISON, P. J., February 26, 1934.—The petitioners in the instant case have requested this court to construe the Act of March 2, 1933, P. L. 6, under the authority of the Uniform Declaratory Judgments Act of June 18, 1923, P. L. 840. The petitioners are partners and own fruit orchards in Pennsylvania. The respondent is a corporation organized and chartered by the United States Government under an Act of Congress known as the Emergency Relief and Construction Act of 1932, and is authorized by its charter to lend money to farmers for general agricultural purposes in the Second Federal Land Bank District, which includes the State of Pennsylvania, and to take as security therefor paper secured by a lien on crops and chattels. The petitioners applied to the respondent for a loan under its said powers, to be secured by a chattel mortgage on certain of petitioners' chattels and also on a fruit crop to be produced in the orchards then owned by them and having growing in them fruit trees planted some years ago. This application was approved by said respondent, and a proper mortgage in compliance with said application, accompanied by a bond

as required by its terms, covering the chattels and fruit crop referred to in said application, was executed by the petitioners and delivered to the respondent. It was conceded that this bond and mortgage were properly drawn and executed, but said respondent refused to make the loan requested, alleging as a reason for that refusal that it could not thus secure a valid first lien, good against third parties, on the fruit crop covered by said chattel mortgage, under the laws of Pennsylvania. The petitioners in reply to this refusal on the part of the respondent advised it that they were informed by counsel that this bond and mortgage did constitute a valid lien on said fruit crop, as against all parties, and that they would expect the respondent to comply with its contract and furnish the money as provided for in said mortgage. To this the respondent replied that it was willing so to comply but declined to do so because it could not secure a valid lien on the fruit crop specified in said mortgage.

The petitioners thereupon filed their petition under the Uniform Declaratory Judgments Act, setting forth the above facts, alleging that the respondent had broken its contract with the petitioners if, in fact, they can give a valid lien on their fruit crop, and further alleging that, if there is delay in determining their rights under the contract, they will suffer injury or loss, and that there will be such delay if they resort to any other remedy than under the Uniform Declaratory Judgments Act.

On this petition, a rule was granted upon the respondent to show cause why the prayer of the petition for a construction of the Act of March 2, 1933, should not be granted, and an answer was filed thereto by the respondent. In its said answer, the respondent admitted all the facts set forth in the petition as to the application for the loan, the execution of the bond and chattel mortgage and delivery of the same, and other like facts, raising but the one question, that is, the inability of the petitioners to give a valid lien upon said fruit crop, said answer specifically raising this question in paragraphs 13 and 14 of said answer, as follows:

"13. Answering paragraph 13 of the petition, this respondent denies that the petitioners have complied with the terms and provisions of their contract and admits that it refused to comply with the terms and provisions of said contract, on its part, because the petitioners could not give a valid lien upon the fruit crops as specified in said chattel mortgage.

"14. That it admits the allegations of paragraph 14 of said petition.

"And further answering said petition, this respondent says that it is ready and willing to comply with its contract with the petitioners, provided the chattel mortgage as set out in said petition gives this respondent a valid lien upon the fruit crops described in said mortgage; that it is advised and verily believes that under the Chattel Mortgage Act of Pennsylvania, same being an act approved March 2, 1933, P. L. 6, the petitioners cannot give a valid lien upon the fruit crops as described in said mortgage, good against the claims of all parties."

The first question raised by the petition and answer, and which the court must consider, even though the respondent does not question the authority of this court to pass upon the questions raised under the Uniform Declaratory Judgments Act, is whether it does have jurisdiction to construe the said Act of 1933 under the provisions of the Uniform Declaratory Judgments Act. In Cryan's Estate, 301 Pa. 386, 389, the Supreme Court said: "Two principal questions are presented for our consideration. The first concerns the jurisdiction of the court below to render a declaratory judgment under the circumstances of this case. All parties joined in asking for such a judgment, but the

question of jurisdiction was raised by this court when the present appeal came on for argument." From this it is apparent that we must first determine the jurisdiction of this court, although all parties here joined in asking for the judgment.

Said act provides: "That courts of record, within their respective jurisdictions, shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. . . .

"Section 2 . . . Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder."

This act has been before our appellate courts on numerous occasions and has been construed by them as to the many different questions raised as to it. It has been held to be constitutional, and the courts have jurisdiction under it when cases are properly brought before that court on questions covered by the act; and in Kariher's Petition (No. 1), 284 Pa. 455, in which the act is discussed at length as to many of its provisions, the court, in speaking of the jurisdictional question, says (p. 471) : "jurisdiction will never be assumed unless the tribunal appealed to is satisfied that an actual controversy, or the ripening seeds of one, exists between parties, all of whom are sui juris and before the court, and that the declaration sought will be a practical help in ending the controversy." In Cryan's Estate, supra, at pages 394, 395, it was said: "In Kariher's Petition (No. 1), supra, 471, we said: 'Jurisdiction [by declaratory judgment] will never be assumed unless the tribunal appealed to is satisfied that an actual controversy or the *ripening seeds of one exist* [the italics are ours]. The expression 'ripening seeds' is repeated in Lyman v. Lyman, 293 Pa. 490, 495; Reese v. Adamson, 297 Pa. 13, 15; Pittsburgh's Consolidated City Charter, 297 Pa. 502, 506; Sterrett's Est., 300 Pa. 116, 123. In the Pittsburgh Charter Case we explained that 'ripening seeds' meant a state of facts indicating 'imminent' and 'inevitable' litigation. See also Sterrett's Estate, supra, 123-4. If differences between the parties concerned, as to their legal rights, have reached the stage of antagonistic claims, which are being actively pressed on one side and opposed on the other, an actual controversy appears; where, however, the claims of the several parties in interest, while not having reached that active stage, are nevertheless present, and indicative of threatened litigation in the immediate future, which seems unavoidable, the ripening seeds of a controversy appear." In the same case, the court said (p. 397) : "As stated earlier in this opinion, in List's Estate, 283 Pa. 255, 257-8, we said that, where an actual controversy existed or litigation between those in interest was inevitable and imminent, one of the purposes of the Declaratory Judgments Act was to enable parties so situated to have 'issues speedily determined which otherwise would be delayed, to the possible injury of those interested [in them], if they were compelled to await the ordinary course of judicial proceedings.' In Girard Trust Co. v. Tremblay M. Co., 291 Pa. 507, 525, we said that a prime purpose of the Declaratory Judgments Act was to 'render practical help' in ending controversies, meaning those which had not reached the stage where other legal relief was immediately available, or those where, under the attending circumstances, old forms of action would not immediately afford the relief required; and we pointed out that the parties concerned in that case might have had their respective rights determined by declaratory judgment prior to the actual controversy there presented."

In the instant case, we have an actual controversy in that the bond and mortgage have been executed and delivered, demand made for the payment due thereon, refusal by the respondent to comply with the terms of the contract, and an allegation that any remedy except under the provisions of this act would cause considerable delay, which would result in loss to the petitioners.

We are therefore of the opinion that this court has jurisdiction under said act of assembly to determine the controversy between the parties in the instant case. This brings us to a consideration of the Act of March 2, 1933, P. L. 6. In considering this act, so that we may have a clear view of the reasons for its passage and its purposes, it will be helpful to consider what the law of Pennsylvania was prior to its passage, as it affected mortgages on chattels, and what benefits could be received by citizens of that Commonwealth by its terms, which will assist us in construing it, for the law permits the court, in construing acts of assembly, to ascertain the legislative intent in passing the law if that can be done, and in doing this to consider the law as it stood, the benefits to be derived from it, and the parties thus to be benefited.

It had been the historical policy of the law of Pennsylvania, but infrequently departed from and then as affecting but a few items, to forbid the mortgaging of chattels in Pennsylvania so as to affect third parties, such as innocent purchasers from the owner or his creditors, however good and binding such mortgages may be between the parties thereto. None of the exemptions to such a policy applied to the crops or other chattels described in the mortgage in the instant case. The Congress of the United States passed an act, approved July 21, 1932, 12 U. S. C. § 1148, by which it set up the regional agricultural credit corporations and authorized them "to make loans or advances to farmers and stockmen, the proceeds of which are to be used for an agricultural purpose." It was then found that under the laws of Pennsylvania the people of that State, otherwise entitled to its benefits, could not take advantage of its provisions, as the laws of the State did not provide for chattel mortgages good as against any persons but those parties thereto, covering the articles required to secure such loans, and the Act of March 2, 1933, was passed to remedy that situation, unfair as it was under the circumstances to all those engaged in agriculture in that State and requiring this assistance from the United States Government. With this purpose of the legislature in our mind, and being familiar as we are, with all the world, as to the hardships of the farmer in recent years and his inability to secure needed funds to carry on his most necessary work in the usual and ordinary way, because of the great depression now burdening this country and the world at large, we feel that we can view the Act of 1933 with a good idea of the intention of the legislature in passing it and that it should be construed in a broad, liberal manner, and with the view that the legislature intended to benefit all who could come under its provisions, in their most extended sense, and not to limit its benefits by a narrow construction of its words. The policy of all the courts at this time is to be liberal in construing legislation, both National and State, so that the largest number of people may secure its benefits and thus we may the sooner get out from under our burdens caused by the present world-wide economic situation. It is in a sense emergency legislation and as such entitled to a most liberal construction.

The Act of 1933 provides in part as follows:

"Section 1. Be it enacted, &c., That any person, association, partnership or corporation engaged in this Commonwealth in the business of farming, or the raising, breeding, fattening or marketing of livestock, may enter into an agreement with and borrow funds from the Reconstruction Finance Corporation,

Regional Agricultural Credit Corporations, the Secretary of Agriculture of the United States, or any Federal agency, including the United States of America, now or hereafter authorized to loan money to agricultural producers, or from any National or State bank, trust company, agricultural credit corporation, incorporated livestock loan company, savings institution, coöperative bank, coöperative credit or marketing association entitled to re-discount privileges with the Federal Intermediate Credit Bank, under the provisions of the Agricultural Credits Act of one thousand nine hundred and twenty-three of the United States, and may give as security for such loan a bond, containing a confession of judgment, secured by a chattel mortgage upon livestock, farm machinery or farm equipment, or upon any crop or crops either planted or to be planted within one year from the date of the execution of such mortgage, or any extension thereof, on lands within this Commonwealth. Such mortgages shall be a lien against the chattels and crops thereby conveyed, and shall be good and available in law against all susequent purchasers or execution creditors, upon the recording thereof as hereinafter directed. Such mortgages must be in writing, signed by the mortgagor, or by his agent duly authorized and constituted, and duly acknowledged by some person authorized to take acknowledgment of deeds. No chattel mortgage of livestock and hay, grain, or other feed stuffs shall be invalid because provision is contained therein that the mortgagor may use and consume such feed stuffs in preserving and preparing for market the livestock covered thereby. Provisions contained in chattel mortgages that property of the same class as is covered by the mortgage shall be included in the mortgage lien, if acquired by the mortgagor subsequent to the execution of the mortgage and prior to its extinguishment, and provisions that the mortgage shall secure, in addition to the principal sum, any further and additional amounts as may be advanced by the mortgagee to the mortgagor within a period of one year from the date of the execution of the mortgage, not to exceed in the aggregate an amount stated in the mortgage, shall be valid and binding."

The first question which might arise under this act is who is to secure its benefits. It says any person, association, partnership, or corporation engaged in the business of farming. Does the owner of a fruit farm come under that designation as well as one who owns a farm on which wheat, corn, and like crops are raised? We are of the opinion he does. Farming is defined to be that which pertains to agriculture, agriculture in its broadest sense includes both farming and horticulture, and horticulture is a branch of plant production, which is one of the main divisions of agriculture. So we have no hesitancy in holding that one who is operating a fruit farm is engaged in the "business of farming". Fruit raising has become so important a part of "farming" in Pennsylvania that it is recognized as a large part of the agricultural life of the State, and it is inconceivable that those so engaged should not be considered by the legislature of the State engaged in the "business of farming". They are so recognized by the Departments of Agriculture of Pennsylvania and of the United States, and we have no difficulty with this question.

The next question is what is meant by the act of assembly when it provides that such persons "may give as security for such loan a bond, containing a confession of judgment, secured by a chattel mortgage upon . . . any crop or crops". What is meant by crop or crops? Again we must bear in mind the purpose and reason for this legislation and the parties intended to reap its benefits, considering these in the broadest sense possible. The definition of a crop is "that which is cropped, cut, or gathered from a single field, or of a

single kind of grain or fruit of any single season; especially, the product of what is planted in the earth; fruit; harvest." Under this definition, certainly a harvest of apples or peaches or other fruit would be a fruit crop and therefore come under the general head of crop. So in general language we have an apple crop, a peach crop, a berry crop, a wheat crop, a hay crop, and so on for each particular thing grown on the farm. The members of our legislature are but ordinary citizens selected to make our laws for us, and they would naturally use the term as they knew it, and hence we could well consider that when they referred to crop or crops they used the term in its best known and widest application, including all things gathered from the farm.

There is a difference between "fructus naturales" and "fructus industriales", the first being crops produced by the powers of nature alone and the second being annual crops planted or sown each year and requiring the attention of man to produce them. It was formerly considered that fruit grown on trees was "fructus naturales", but we are of the opinion that that is no longer so if it ever was correct. It is a matter of common knowledge that in years gone by the orchard on the farm was a matter of but little importance, each farmer producing but little, if any, more fruit than was required for his own personal use. At that time the trees were not cultivated but merely planted, the crop was gathered from them when they reached bearing age, and this continued until the trees died. Then they may have been considered "fructus naturales", but the situation is now absolutely different. The orchards now are of a great commercial value and the crops the principal care of the owner. The care and farming of them requires much more outlay of time and money than any other crop on the farm, such as wheat, corn, oats, etc. The trees must be pruned by those having special knowledge of how this must be done; the ground must be cultivated so as to destroy insects, worms, and like harmful pests; the trees must be sprayed a number of times each year, and each time for a different purpose and with different sprays, and the trees must be cared for and tended most carefully to produce the crop. Certainly this could not be said to be "fructus naturales", as for instance a walnut crop or chestnut crop from trees growing in the fields or mountain without anything done to them year in and year out. We would have no hesitancy in holding that the fruit from an orchard now was a highly cultivated crop and clearly one which came under the designation of "fructus industriales". There has not been cited to us, nor have we found, any case in Pennsylvania deciding this question, but in the case of Twin Falls Bank & Trust Co. v. Wienberg et al., 44 Idaho 332, 257 Pac. 31, where the question was whether a chattel mortgage, which conveyed "all crops grown during the season of 1921 of whatsoever nature" included apple and other fruit crops, the court said (p. 338):

"That an apple crop is personal property and would be subject to chattel mortgage in the absence of statute is no doubt the modern rule, and notwithstanding earlier decisions to the contrary, we think is supported by the sounder reasoning. Crops were divided into two general classes: *Fructus naturales*, crops produced by the powers of nature alone, and *fructus industriales*, annual crops that must be planted or sown each year, and require the attention of man to produce them, such as planting, necessary manurance, etc. It was formerly held that where 'the root or tree was perennial, living for a number of years, the fruit produced by it while growing was *fructus naturales*.' This doctrine now finds little support, and 'the correct test to apply is to ascertain whether the annual fruit is produced by the annual labor of man, such as necessary manurance or other industry, or whether the fruit is referable to the industry of man only at the period when its seed or root was first planted, and there-

fore owes its continued existence to nature. In the former case, the fruits of the plant are *fructus industriales*, although the plants themselves are *fructus naturales*. Of such character are hops, the root from which the vine grows being perennial, but their production necessitating the annual industry of man in making of hills and setting of poles; and peaches, apples, or other fruits cultivated for the market.' (17 C. J. 380.)

"It is common knowledge that apple and other fruit trees require annual pruning, spraying and cultivation in order to produce marketable crops. We are of the opinion that an apple crop is clearly *fructus industriales*, and, as such, the subject of chattel mortgage."

In Francis v. Roberts et al., 73 Utah 98, 102, 272 Pac. 633, it is said by the court:

"It is very doubtful whether a crop produced by artificial irrigation and harvested annually could be properly classified as fructus naturales. But it is wholly unnecessary in this case to consider or determine that question. The distinction between fructus industriales and fructus naturales is not important here, for both are comprehended within the term 'crops.' 17 C. J. 378; *State* v. *Crook*, 132 N. C. 1053, 44 S. E. 32."

As to whether fruit trees are planted, we do not deem it necessary to make any extended discussion, for we feel that it is an absolute fact known to all that they are set out, that is planted, when young, and carefully cultivated until some years later when they reach bearing age.

This brings us to a consideration of the last question raised before us in the discussion relative to the construction of the Act of 1933, that is, what the legislature intended when it said: "any crop or crops either planted or to be planted within one year from the date of the execution of such mortgage, or any extension thereof, on lands within this Commonwealth." Again, in considering this clause of the act of assembly, we must consider the purpose of the legislation and who it was intended to benefit and the emergency which caused its enactment, and give to it the most liberal construction so as to reach the largest number of persons to be benefited, and not construe it so strictly as to exclude many of those who should reap the benefits of it. Did the legislature of Pennsylvania intend only to cover the men who tilled the soil so as to raise the customary crops of wheat, corn, and like products, or did it intend also to include that very large class of farmers who had turned to fruit culture and had planted all, or a very great proportion of, their farms in orchards, now one of the important money crops of the State. We are not willing to construe it in such a narrow way as would exclude that important class of farmers, nor can we see that the language of the act bears that interpretation. Taking the language as used, "crop or crops either planted or to be planted within one year from the date of the execution of such mortgage", we cannot see how it could intend but one thing, on the one hand a crop or crops planted or, on the other hand, a crop or crops which will be planted within one year from a given date. To attempt to construe this to mean that the crop or crops planted must have been planted within 1 year before the date of the mortgage would be giving to the language used a most strained interpretation. To so construe this sentence to have it mean that the phrase "within one year from the date of the execution of the mortgage" refers to the crop planted as well as to the crop which may be planted is to read this language in a manner contrary to our understanding of the English language. How can it be contended that the word "from", as so used, refers to the date preceding the action? It cannot so refer and we do not consider the sentence ambiguous as to its meaning. It is clearly meant as if the

word "now" or "already" was used and means either crop or crops now or already planted or crop or crops to be planted within the year. We have no hesitancy in so construing this sentence and holding that it applies to a fruit crop already planted when the mortgage was executed, or a crop planted within 1 year thereafter. To construe it otherwise, even if the language used was not as clear as it is, would be to deprive many raisers of Pennsylvania crops of its benefits. I refer to berry crops, hay crops, such as timothy, clover and alfalfa, and other large crops produced on Pennsylvania soil. We do not believe such was the intention of the legislature, and by construing the words of the act in their usual and sensible signification we are carrying out that which the legislature intended. That it was intended to cover crops not planted within 1 year before the execution of the mortgage is indicated from the provision of the act that "no chattel mortgage of livestock and *hay* [italics ours], grain, or other feed stuffs shall be invalid", etc. This is a recognition that hay is included in the articles which may be mortgaged, and, as it is not a crop planted each year, we see in that provision some indication of what was in the legislative mind. But apart from that, the language used is clear to us and, we are satisfied, covers a fruit crop such as is included in the mortgage in the instant case.

In Wiesheier et al. v. Kessler, Admr., 311 Pa. 380, 384, 385, Mr. Justice Maxey, speaking for the Supreme Court, said:

"The foregoing is in accord with the well established rules of interpretation. 'It is always to be presumed that a statute was intended to have the most reasonable and beneficial operation that its language permits': 25 R. C. L., section 255, page 1018; Orlosky v. Haskell, 304 Pa. 57, 66, 155 A. 112. In Pocono Spring Water Ice Co. v. American Ice Co., 214 Pa. 640, 648, 64 A. 398, this court said, quoting from Endlich on Interpretation of Statutes, section 107: 'Such [remedial] statutes "are to be construed giving the words the largest, the fullest, and most extensive meaning of which they are susceptible. The object of this kind of statutes being to cure a weakness in the old law, to supply an omission, to enforce a right, or to redress a wrong, it is but reasonable to suppose that the legislature intended to do so as effectually, broadly and completely, as the language used, when understood in its most extensive signification, would indicate." ' This was also quoted approvingly by this court in Cresson Boro. v. Seeds, 286 Pa. 288, 295, 133 A. 501, and in Toll v. Beckerman, 299 Pa. 1, 5, 148 A. 904. 'Where, on a reasonable interpretation, a statutory provision is susceptible of a construction which will carry into effect the avowed purpose of the act, that construction should be given to it, rather than one which in practical operation might defeat such purposes': Com. v. Lowe Coal Co., 296 Pa. 359, 367, 145 A. 916. See also Jermyn's Election Expenses, 57 Pa. Superior Ct. 109. In Turbett Twp. v. Port Royal Boro., 33 Pa. Superior Ct. 520, 524, Judge RICE said: 'The effects and consequences of the proposed construction of a law, as well as its reason and spirit, will be looked into in determining the legislative intent, which is the criterion by which all acts must be construed. Hence, if there is room for construction, the court will prefer that construction which is most consonant with the purpose for which the act was passed.' "

We have endeavored so to construe this act as to carry out the legislative intent, giving to it that broad and liberal interpretation to serve its evident purpose which will best reach the desired end. We do not feel that we have in any way read into the act anything not contained in it, or strained the language used in ascertaining its meaning. We have viewed it in light of what it was, in our opinion, intended to correct in our law, under the different circumstances which had arisen in the emergency confronting us, and which, we believe,

requires a broad view of its purposes. We will grant the relief prayed for by the petitioners and enter judgment in their favor.

Now, therefore, February 26, 1934, it is hereby ordered, adjudged, and decreed, that this court has jurisdiction in the instant case; that the act of assembly approved March 2, 1933, P. L. 6, includes in its provisions under the term "engaged in the business of farming" those engaged in raising fruit and other crops of a like nature; that fruit trees are planted within the meaning of that act of assembly, and the crop or crops gathered therefrom are such crop or crops as are included within its scope and subject to the lien of a chattel mortgage thereunder; that a fruit crop or crops, although the trees from which the same are harvested were not planted within 1 year before the execution of, the chattel mortgage covering the same, are included in its provisions and subject to the lien of a chattel mortgage covering the same; that the chattel mortgage in the instant case, having been properly and legally executed and delivered and including the property contained in the application for the loan approved by the respondent, is hereby held to give to the respondents a valid lien on said property, so described in said mortgage, good against any and all parties; and hence, the petitioners are entitled to receive from the respondent the sums set forth in said chattel mortgage according to its terms.

From Albert Strite, Chambersburg, Penna.